UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN

SHATIA S. MATHIS, in her capacity as the Personal Representative of the Estate of WILLIAM MATHIS,

    *Plaintiff,*

v.

NURSE MCINNIS; ERIN BYRNE; KIM FARRIS; CORIZON HEALTH, INC. d/b/a CORIZON OF MICHIGAN; QUALITY CORRECTIONAL CARE OF MICHIGAN, P.C.; JOHN DOE MEDICAL PROVIDERS,

    *Defendants*.

Case No.

Hon.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

    NOW COMES Plaintiff, Shatia S. Mathis, the administratrix of the Estate of William Mathis, by and through her attorneys, JOHNSON LAW, PLLC, complaining of Defendants and respectfully alleges as follows:

**JURISDICTION AND VENUE**

    1.    This is a civil rights action in which the Plaintiff seeks relief for the violation of rights secured by 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, and MCL § 600.2922.

1

2. Jurisdiction of this Court is found upon 28 U.S.C. § 1331 and pendent jurisdiction over state claims that arise out of the nucleus of operative facts common to Plaintiff's federal claims.

3. The events that give rise to this lawsuit took place at the Macomb Correctional Facility in Macomb County, MI.

4. Venue is appropriate in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because the individual Defendants are officials and employees of the Michigan Department of Corrections and the events that give rise to the lawsuit took place in the County of Wayne, State of Michigan.

## **PARTIES**

5. Plaintiff, Shatia Mathis, is the Administratrix of the Estate of William Mathis. At all times relevant, William Mathis was a prisoner in custody of the Michigan Department of Corrections ("MDOC").

6. Defendant, Michigan Department of Corrections, is a Michigan governmental agency that operates correctional facilities in Michigan.

7. Defendant, Nurse McInnis, at all times relevant was employed by the Michigan Department of Corrections and was acting under color of law.

8. Defendant Farris was at all pertinent times an employee of Corizon Health, employed as a Physician Assistant to provide medical care to Mr. Mathis.

9. Defendant Byrne and McInnis were at all pertinent times employees of the Michigan department of Corrections, employed as nurses to provide medical care to Mr. Mathis.

10. Defendant Corizon does business as Corizon Health Inc, Corizon of Michigan, and Quality Correctional Care of Michigan, P.C. They are referred to jointly herein as Defendant Corizon, or the Corizon Defendants.

11. Defendant, Corizon Health, Inc. ("Corizon"), is contracted by the Michigan Department of Corrections ("MDOC") to provide medical services to inmates housed within MDOC correctional facilities. Through its doctors and medical providers, Defendant Corizon is responsible for providing health care to inmates including but not limited to approving necessary visits with specialists, approving necessary surgeries and treatments plans, and approving medications prescribed to incarcerated individuals. Defendant Corizon acts through its decision makers and supervisors. At all times relevant, Defendant Corizon was acting under the color of law.

12. Defendant Corizon, Inc. is a Delaware corporation with a principal place of business located at 103 Powell Ct., Brentwood, TN 37027. Corizon may be served at its registered agent, The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, MI, 48170. Corizon is responsible for providing medical

care to the prisoners throughout the state. When a prisoner has a medical issue, it is Corizon who will deliver health care services to the prisoner.

13. Defendant Quality Correctional Care of Michigan, P.C. is a Michigan Corporation with a principal place of business located at 6452 Millennium Drive, Suite 100, Lansing, MI, 48917. QCC may be served at its registered agent, The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, MI, 48170. QCC is in a contractual relationship with Defendant Corizon to administer medical care to prisoners. The exact nature of the contractual relationship between Corizon and QCC is unknown. QCC is responsible for providing medical care to the prisoners throughout the state. When a prisoner has a medical issue, it is QCC who will deliver health care services to the prisoner.

14. Defendant Corizon derives substantial income from doing business in Michigan.

15. Upon information and belief, Corizon contracted with the Michigan Department of Corrections to provide medical care to prisoners housed in MDOC facilities throughout the State of Michigan.

16. Dr. Keith Papendick ("Papendick") was at all times relevant employed by Corizon and contracted by MDOC as the Utilization Manager. Papendick is responsible for approving necessary specialist visits and procedures for individuals incarcerated with the MDOC. Papendick is a Corizon policymaker/decisionmaker.

17. Defendant Corizon is responsible for ensuring MDOC inmates see the necessary specialists to treat serious medical needs. Pursuant to Corizon's policy to deny necessary care for non-medical reasons, such as cost-saving and profit boosting, Defendant Corizon denied Plaintiff the care necessary to preserve his life.

18. Defendant, John Doe Medical Care Provider, at all times relevant was employed by the Michigan Department of Corrections and/or Corizon and were acting under color of law.

19. Defendants' complained-of actions and inactions were done intentionally, willfully, purposely, purposefully, wantonly, recklessly, deliberately, consciously, carelessly, knowingly, sadistically, maliciously and with deliberate indifference.

## STATEMENT OF FACTS

20. On 6/23/18 at around 6:00 AM, decedent William Mathis went to Health Care in the Macomb Correctional Facility to receive his prescription medications, including Ultram and Norco, which he was prescribed as a chronic pain patient.

21. While in the lobby of health care, Mr. Mathis slipped by a water fountain and fell, striking his head and left shoulder extremely hard, such that the sound took many of those present by surprise.

22.     Nurse McInnis purported to assess Mr. Mathis and because he was not able to get up and walk, she transported him via a wheelchair to the emergency room, where she conducted her so-called assessment for no more than minutes. Nurse McInnis then sent Mr. Mathis back to his cell.

23.     Because of the head trauma, Mr. Mathis had to be taken via wheelchair back to his cell despite being able to walk to healthcare earlier that morning.

24.     Mr. Mathis returned to Health Care at around 11:30 AM and Nurse McInnis was no longer there.

25.     Mr. Mathis spoke to Nurse Erin Byrne and PA Kim R. Farris and advised them of that morning's event, including the significant trauma to his head. Mr. Mathis rated his head pain at "11" on a 0-10 scale.

26.     Given his known history of suffering from various medical conditions resulting in chronic pain for which he took daily Ultram and Norco among other pain medications, this should have alerted Nurse Byrne and PA Farris that Mr. Mathis had sustained a significant injury and required immediate evaluation by a physician or transfer to a hospital.

27.     Notwithstanding the need for an immediate assessment by a physician, Nurse Byrne and/or PA Farris advised Mr. Mathis to go back to his cell and to return at the 5:00 medical callout if he was still in pain.

28. Mr. Mathis went back to his cell, as instructed by these defendants, and was found unresponsive that afternoon at around 7:00 PM. The prison corrections officers began CPR and transported Mr. Mathis to the hospital, but Mr. Mathis died from acute subdural hematoma, proximately caused by hitting his head that morning and not being treated for it properly by Nurse McInnis, Nurse Byrne, and/or Farris.

29. PA Farris and Nurse Byrne, upon being confronted by a patient claiming he hit his head and being slow to respond to their questions, should have conducted a more thorough examination and had him transferred to a hospital for appropriate and required evaluation, including an emergency CT scan. Instead, Nurse Byrne sent Mr. Mathis back to his cell, as ordered by PA Farris.

30. Further in contravention to official written MDOC and official written Corizon policy and the applicable standard of care, Nurse McInnis did not create a medical note or otherwise document the fall, the injury, or her purported assessment and examination of Mr. Mathis, nor did she seek or recommend an evaluation by a physician or transfer out of the facility for evaluation in a hospital.

31. McInnis was required by official written MDOC and official written Corizon policy, and the standard of care, to have documented Mr. Mathis' fall in three ways:

    a. fill out an Accident Report, which is an MDOC form;

    b. document the fall and her examination in Mathis' EMR/HER;

    c.  document the fall and her examination the health care log book.

32.    Had McInnis completed any of these required documentations, PA Farris and Nurse Byrne would have seen that Mr. Mathis did in fact have a serious fall in health care that morning, instead of assuming he either fell in the housing unit or not at all.

33.    As a direct and proximate cause of Defendants' actions and inactions, Mr. Mathis died.

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Eighth Amendment – Deliberate Indifference)

34.    Plaintiff incorporates herein all the prior allegations.

35.    At all times relevant, Defendants were acting within the course and scope of their employment with MDOC and/or Corizon and were acting under color of state law with the authority granted to them as correctional healthcare providers.

36.    At all times relevant, pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Mr. Mathis had a right to be free from cruel and unusual punishment and to receive proper and adequate medical care while incarcerated in the custody and control of the Michigan Department of Corrections and the supervision and control of the Defendants.

37.    At all times relevant, William Mathis had a right to adequate and sufficient medical care and treatment such that his medical conditions and his life

would be preserved and would be free from needless unjustified and preventable pain, suffering, and deterioration of his health and well-being.

38. All times relevant, Defendants with malice, recklessness, and callous and deliberate indifference to William Mathis's federally protected rights to be free of cruel and unusual punishment and to medical care that adequately treated his serious medical needs, knowingly allowed Mr. Mathis to suffer through head trauma which ultimately resulted in his death, without appropriate medical health care which combined to cause pain, suffering, deterioration of health and ultimately Mr. Mathis's death.

39. As a proximate result of the illegal and unconstitutional acts of the Defendants, William Mathis died and suffered damages as a result.

### *Monell* Liability for Defendant Corizon: Failure to Train/Supervise; and as an alternative *Monell* theory of liability: Policy, Custom, and/or Practice

40. Defendant Corizon has a policy, practice, or custom of deliberate indifference to the treatment of prisoners. This is demonstrated through the actions and inactions of Corizon's policymakers and decisionmakers, such as Dr. Keith Papendick.

41. On March 28, 2018, this widespread Corizon policy was evidenced in deposition testimony in the case of Temujin Kensu v William Borgerding, M.D., et

al, 4:16-cv-13505, by former Corizon employee Physician Assistant ("P.A.") Marianne McKissick.

42.   P.A. McKissick, the primary treater at MRF for Kensu's serious medical needs from October 2016 until December 2017, gave deposition testimony regarding Corizon's treatment of Kensu. During questioning regarding Corizon's policy of denying claims for necessary medical treatment, when McKissick was asked, under oath, how often Corizon would deny claims for consults with specialists, McKissick responded that "90 percent, 99 percent of the time" Corizon would deny the physician's request.

43.   Keith Papendick, Corizon Utilization Manager, testified that Corizon does not deny. Rather than outright "deny" treatment, Corizon "defers" the treatment.  This "deferral" has the same substantive effect on the patient as an outright denial: The patient never receives the treatment.  This policy, practice, or custom of "deferring" requests is in deliberate indifference to a prisoner's serious medical needs.

44.   When P.A. McKissick says the policy to deny 90% to 99% of all requests, she means that 90% to 99% of all requests are "deferred."

45.   McKissick further testified that all of her recommendations for a consultation with a specialist were based upon her experience as a physician's assistant and the standard of care necessary to properly treat the patient. Corizon

"deferred" those recommendations, the recommendations of a physician for treatment necessary to provide adequate healthcare to a patient for their serious medical needs, 90% to 99% of the time.

46. Plaintiff and other inmates have collectively received thousands of denials of claims, and thousands of instances in which Defendants refused to provide adequate care to prisoners.

47. During the time period of Corizon's contract with the MDOC, Defendants Corizon and QCC was directly responsible for the treatment of Plaintiff and other inmates, and has caused deliberate indifference to be demonstrated to Plaintiff and other inmates' serious medical needs.

48. In fact, Defendant Corizon leads by example, so to speak, by allowing and encouraging their subordinates to be deliberately indifferent to prisoners' serious medical needs, as is demonstrated by numerous verdicts across the country against Corizon, finding Corizon liable for deliberate indifference violations and awarding both compensatory damages as well as punitive damages to plaintiffs. These verdicts, and even a contempt order resulting in millions of dollars in fines, however, have not had the desired effect declared by the legislature's purpose in enacting punitive damages in civil rights cases, since it did not deter them or others from engaging in similar misconduct.

49. Defendants Corizon and QCC could have authorized Plaintiff and other inmates' required treatments, or many other treatments needed to address their serious medical needs but repeatedly chose not out of deliberate indifference to Plaintiff's and other inmates' serious medical needs. They chose to let Plaintiff and other inmates suffer. They also actively participated in the mistreatment of Plaintiff and other inmates by "deferring" required medical treatment.

50. Defendants Corizon and QCC, through its employees, officers, and agents, routinely acted according to a plan or policy to deny Plaintiff and other inmates access to treatment for their serious medical needs.

51. Defendants Corizon and QCC, through its employees, officers, and agents, acted to approve of the abuse and denial of Plaintiff and other inmates' constitutionally protected access to treatment for their serious medical needs.

52. Defendant Corizon's and QCC's actions were and are clear violations of the Eighth Amendment of the Constitution, as Defendant Corizon and QCC routinely demonstrated a deliberate indifference to Plaintiff and other inmates' serious medical needs.

53. Defendant Corizon and QCC acted to approve of the abuse and denial of Plaintiff and other inmates' constitutionally protected access to treatment for their serious medical needs.

54. Defendant Corizon's and QCC's decision to withhold appropriate medical care and treatment from Plaintiff and other inmates as described herein with deliberate indifference to Plaintiffs' serious medical needs, while Plaintiffs were in the MDOC's custody, violated the Eighth Amendment.

55. Defendant Corizon's and QCC's plan or policy to unreasonably deny or "defer" prisoners' access to adequate medical treatment for their serious medical needs is evidenced across a long history of numerous claims, lawsuits, and grievances.

56. This unwritten Corizon policy to deny up to 99% of providers' requests, has create an environment within Corizon in which providers, such as McKissick and for purposes of the instant complaint, the named defendant treaters, know from the outset that any treatment they seek for their patients will be denied. This unwritten policy further establishes an unwritten policy that Corizon does not care about its patients if required treatment costs money, but only about its profits.

57. Plaintiff required treatment that would have cost Corizon money and the named defendant treaters knew that the unwritten Corizon policy demanded that the plaintiff not be treated, which is why the named defendant treaters acted as they did.

58. Defendant Corizon's herein complained-of policies were and are clear violations of the Eighth Amendment of the Constitution, as Defendant Corizon

routinely demonstrated a deliberate indifference to inmates' serious medical needs. This policy to demonstrate deliberate indifference to inmates such as Plaintiff, directly and proximately caused Plaintiff to suffer the herein complained of harm.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a judgment in Plaintiff's favor and against the Defendants, and award Plaintiff compensatory and punitive damages to be determined by a jury, reasonable attorney fees and costs of this action, and any such other relief as appears just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38.

          Respectfully Submitted,

          JOHNSON LAW, PLLC

By:   */s/ Solomon M. Radner*
      Ven Johnson (P39219)
      Solomon M. Radner (P72653)
      Madeline Sinkovich (P82846)
      Attorneys for Plaintiff
      535 Griswold, Suite 2600
      Detroit, MI 48226 (313) 324-8300
      vjohnson@venjohnsonlaw.com
      sradner@venjohnsonlaw.com
      msinkocvich@venjohnsonlaw.com

Dated: March 31, 2021