UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHATIA S. MATHIS, in her capacity
as the Personal Representative of the
Estate of WILLIAM MATHIS,

                         Plaintiff,

v.

CYNTHIA McINNIS, ERIN BYRNE,
KIM FARRIS, CORIZON HEALTH,
INC., QUALITY CORRECTIONAL
CARE OF MICHIGAN, P.C., and
JOHN DOE MEDICAL PROVIDERS,

                         Defendants.

_____/

Case No. 21-cv-10734

Paul D. Borman
United States District Judge

**OPINION AND ORDER GRANTING DEFENDANT CYNTHIA McINNIS'S
MOTION FOR SUMMARY JUDGMENT (ECF NO. 70)**

This is a prisoner civil rights case under 42 U.S.C. § 1983 arising from the

death of William Mathis, a former inmate of the Michigan Department of

Corrections. Plaintiff Shatia Mathis, as Personal Representative of the Estate of

William Mathis, brought this action against the following defendants: Registered

Nurse Cynthia McInnis, Registered Nurse Erin Byrne, Physician Assistant Kim

Farris, Corizon Health Inc., Quality Correctional Care of Michigan, P.C., and John

Doe Medical Providers.

1

Now before the Court is Defendant Cynthia McInnis's Motion for Summary Judgment seeking dismissal of Plaintiff's Eighth Amendment deliberate indifference claim against her (ECF No. 70). The motion has been fully briefed.

On December 20, 2023, the Court held a hearing on Defendant's Motion for Summary Judgment, at which counsel for Plaintiff and Defendant McInnis appeared.

For the reasons that follow, the Court GRANTS Defendant Cynthia McInnis's Motion for Summary Judgment and DISMISSES Plaintiff's Eighth Amendment deliberate indifference claim against Defendant McInnis WITH PREJUDICE.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Relevant Facts

### 1. The parties

On June 22, 2018, William Mathis was a prisoner incarcerated in the Michigan Department of Corrections' (MDOC) Macomb Correctional Facility (MRF) in Lenox Township, Michigan. (ECF No. 33, Plaintiff's First Amended Complaint (FAC) ¶¶ 5, 18.) Mr. Mathis had a history of health problems for which he received treatment, including HIV, polyneuropathy due to drugs, hypertension, acute and chronic congestive heart failure, embolism and thrombosis (i.e., blood clots), chronic obstructive pulmonary disease, and cirrhosis of the liver. (ECF No. 70-2, Deposition

2

of Pl. Expert RN Valerie Tennessen, at p. 35, PageID.489) (ECF No. 70-6, Deposition of Def. Cynthia McInnis, at pp. 32-33, PageID.613-14.)

Defendant Cynthia McInnis is a Registered Nurse (RN), employed with the MDOC. (ECF No. 70-6, Def. McInnis Dep. at p. 12, PageID.593.) She was familiar with Mr. Mathis and was aware that he had several serious medical conditions, having provided him various medications and taking his blood pressure in the past, but she stated that he rarely required any type of emergent care. (*Id.* at pp. 31-32, PageID.612-13.)

### 2. Mr. Mathis falls in the health center lobby on June 22, 2018

On Thursday and Friday, June 21-22, 2018, Defendant McInnis was working the "midnight shift" of 6:00 p.m. Thursday to 6:30 a.m. Friday in the MRF health center. (*Id.* at p. 31, PageID.612.) At approximately 6:18 a.m. that Friday, Mr. Mathis was in the MRF health center lobby waiting in line to obtain his morning medication. (*Id.* at p. 33, PageID.614) (ECF No. 70-7, Video of healthcare lobby on June 22, 2018, at 6:18:18 a.m.) Mr. Mathis stumbled and fell and struck his shoulder on the ground and his head on a door as he fell. (ECF No. 70-6, Def. McInnis Dep. at p. 34, PageID.615) (ECF No. 70-7, Video at 6:18:29-30 a.m.). McInnis stated that while it looked like Mr. Mathis's head "bumped against the wall," Mr. Mathis told

her that he did not hit his head. (ECF No. 70-6, Def. McInnis Dep. at p. 35, PageID.616.)

McInnis, who had been performing medication-related blood pressure checks and administering insulin injections to awaiting prisoners that morning, saw Mr. Mathis fall. (ECF No. 70-6, Def. McInnis Dep. at p. 34, PageID.615.) She then saw that Mr. Mathis was being helped up by two corrections officers. (*Id.* at p. 37, PageID.618) (ECF No. 70-7, Video at 6:18:35-6:19:23 a.m.) McInnis secured a wheelchair, with the assistance of another prisoner, and helped place Mr. Mathis in the wheelchair. (ECF No. 70-6, Def. McInnis Dep. at p. 37, PageID.618) (ECF No. 70-7, Video at 6:18:35-6:19:23 a.m.)

### 3.   McInnis's treatment of Mr. Mathis

McInnis then asked Mr. Mathis to come into the "emergency room" inside of medical services so she could assess him. (ECF No. 70-6, Def. McInnis Dep. at p. 38, PageID.619.) Mr. Mathis responded "Nope, I refuse. I'm going to chow. I'm going to chow. I am not coming back. I'm going." (*Id.* at pp. 38, 40, PageID.619, 621.) MDOC policy states that outside of involuntary mental health treatment, a medical provider may not provide medical care to a prisoner if that prisoner does not provide consent. (ECF No. 70-8, MDOC PD 03.04.105 – Informed Consent to Medical Care, PageID.701-04.) McInnis twice repeated her request to assess Mr.

4

Mathis, stating: "Okay, I'll ask you again. Will you go get your medicine, stay in the wheelchair, go get your medicine and then come back and see me when you're done?" (ECF No. 70-6, Def. McInnis Dep. at pp. 39-40, PageID.620-21.) Mr. Mathis then agreed and was pushed into the "emergency room" by another prisoner a few minutes later, after receiving his morning medication. (*Id.* at p. 39, PageID.620) (ECF No. 70-7, Video at 6:22–6:23 a.m.)

> McInnis then conducted an assessment of Mr. Mathis, including:
>
> Neurological checks. I checked his head for bumps, bruises, open areas, abrasions, scratches, skin tears, anything. Palpated it with my hand with a rubber glove on, with my hand. I had him raise his arms and move them around, because he fell on his shoulder, put his arms above his head, arms down, arms out in front of him, checked his pupils which were, didn't indicate any kind of head trauma at that time. Assessed him for any kind of a head trauma, signs and symptoms like upset stomach, nausea, vomiting, and I took, and I gave him all the symptoms, you know, "You get tired, you start wanting to vomit and get nauseated, you'd better get back right over to Healthcare and notify us. "And I also took his blood pressure and I told him to do not get out of that wheelchair, use the wheelchair today.

(ECF No. 70-6, Def. McInnis Dep. at pp. 42-43, PageID.623-24.)

Mr. Mathis repeatedly told McInnis that he was okay, that he hit his shoulder and not his head, and that he was having no pain. (*Id.* at p. 84, PageID.665.) McInnis found no visible signs of injury on Mr. Mathis – "[n]o open areas, bumps or bruises seen." (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.714.) All of Mr.

Mathis's vital signs were normal, he was fully oriented to person, place, and time, and he spoke clearly. (*Id.*) His skin was appropriately warm and dry, and he was able to move all his extremities without pain. (*Id.*) Mr. Mathis did not want to remain in healthcare, and he left the healthcare center by wheelchair. (ECF No. 70-6, Def. McInnis Dep. at p. 62, PageID.643)[1] Before he left, McInnis instructed Mr. Mathis "to notify us if he had any changes in mentation, any signs of headache, dizziness, nausea, vomiting, [or] upset stomach," "to use the wheelchair the rest of the day, and if there's any changes to notify us immediately." (*Id.* at p. 85, PageID.666.)

After Mr. Mathis left healthcare, McInnis continued to treat patients, answer the phone, and, because it was nearing the end of her shift, she gave a verbal report to the day-shift workers starting their shift. (ECF No. 70-6, Def. McInnis Dep. at p. 44, PageID.625.) McInnis had written Mr. Mathis's vital signs on a piece of payer and placed the paper in her work mailbox, but because "[i]t started to become very hectic" in healthcare,  she did not chart her encounter with Mr. Mathis. (*Id.* at pp. 43-45, PageID.624-26 (stating "when I left that day, I completely forgot to write a nurses' note on [Mr. Mathis] [] [p]robably because it was end of shift and there was

---

[1] McInnis explained that Mr. Mathis generally used a cane when walking, but that he had a "wheelchair detail for long distances." (ECF No. 70-6, Def. McInnis Dep. at pp. 39-40, 86, PageID.620-21, 667.)

[sic] 15 million things going on[.]").) However, McInnis verbally reported to the oncoming dayshift workers, and specifically nurses Monica Thompson and Defendant Erin Byrne, "what happened" with Mr. Mathis – that "he had a fall out in the lobby" – and she requested that they "Please keep an eye on Mr. Mathis." (*Id.* at p. 45, PageID.626.)

McInnis charted her treatment of Mr. Mathis when she returned to work the following Monday morning. (*Id.* at p. 46, PageID.627) (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.714.)

### 4.   Mr. Mathis returns to healthcare

At 10:30 a.m. on Friday, June 22, 2018, approximately four hours after Mr. Mathis left healthcare, his cell mate notified Corrections Officer Tony Bohannon that Mr. Mathis was not feeling well. (ECF No. 70-14, Excerpt from Critical Incident Report MRF-096-18, PageID.1022.) Mr. Mathis told Officer Bohannon that his head was hurting really bad. (*Id.*) Officer Bohannon notified healthcare, who came to the unit and escorted Mr. Mathis to healthcare for treatment. (*Id.*)

Defendant Erin Byrne, RN, assessed Mr. Mathis in healthcare at approximately 11:18 a.m. on Friday, June 22, 2018. (ECF No. 70-9, Excerpt from

Pl.'s Med. Record, PageID.712-13.)[2] At that time, Mr. Mathis reported to Byrne that he tripped, lost his balance, and fell in his housing unit, hitting his head on a door. (*Id.*) He denied losing consciousness and complained of a headache and left hip pain. (*Id.*) (ECF No. 70-12, Def. Byrne Dep. at p. 37, PageID.768.) Byrne then assessed Mr. Mathis. She found that his skin temperature was normal and dry, and he had no external signs of injury, including on his head. (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.712-13.) Mr. Mathis was awake, aware, and oriented "x4," and his pupils were equal and reactive to light. (*Id.*)

Byrne did note that Mr. Mathis was slow to respond to questions, which she found was the only external sign of any potential injury. (*Id.*) However, Byrne did not know if Mr. Mathis's slow speech was his baseline or the result of any injury. (ECF No. 70-12, Def. Byrne Dep. at p. 55, PageID.786.) Defendant Byrne did not see any signs or symptoms of a concussion or brain bleed. (*Id.* at p. 115, PageID.846.) She then referred Mr. Mathis to Defendant Kim Farris, a Physician Assistant (PA), for further assessment. (*Id.* at p. 39, PageID.770.)

---

[2] Defendant Byrne was not an employee of either the MDOC or Defendant Corizon. She is a registered nurse contracted to work for the MDOC through a staffing agency called Cell Staff. (ECF No. 70-12, Deposition of Defendant Erin Byrne, at p. 19, PageID.750.) Defendant Byrne worked at MRF for about six months – from February through August of 2018. (*Id.* at p. 21, PageID.752.)

Defendant Farris assessed Mr. Mathis and completed a "mini-mental status evaluation." (ECF No. 70-15, Excerpt from Critical Incident Report MRF-096-18, PageID.1024.) Farris noted that Mr. Mathis "reported he was walking in his unit and stumbled and fell." (*Id.*) Farris found upon examination that Mr. Mathis was alert and oriented "x3," and his head, face, hands, elbows, and knees did not show any sign of trauma, hematomas, contusions, or abrasions. (*Id.*) Mr. Mathis was able to successfully follow Farris's commands "related to testing his coordination, strength, moving his head, [and] extremities," and he denied any chest pain, shortness of breath, dizziness, visual changes, nausea, or vomiting, but did say he had a slight headache. (*Id.*) Farris instructed Byrne to let Mr. Mathis stay in the emergency room for a while longer and then reassess him in approximately one hour. (*Id.*)

Byrne subsequently informed Farris that Mr. Mathis said he was feeling better and that he wanted to return to his housing unit. (*Id.*) Farris instructed Byrne to make sure he was called back "at the next medication pass to do a follow up for his vital signs and neuro assessment." (*Id.*)

### 5.    Mr. Mathis is found unresponsive in his cell

At around 6:00 p.m. on June 22, 2018, fellow prisoner Larry Simpkins found Mr. Mathis unconscious in his cell. (ECF No. 76-12, Deposition of Larry Simpkins

at pp. 18-19, PageID.1529.) Simpkins attempted to wake Mr. Mathis, but when he would not wake, Simpkins called for corrections officers for help. (*Id.*)

Upon the officers' arrival, they found no pulse and no spontaneous breathing by Mr. Mathis. (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.706.) The corrections officers attempted cardiopulmonary resuscitation (CPR) on Mr. Mathis, and a nurse administered two doses of Narcan to Mr. Mathis and used an automated external defibrillator (AED) on him. (*Id.*) Mr. Mathis regained a pulse and once an ambulance crew arrived, they placed an IV line, intubated Mr. Mathis, and then transported him to the hospital in critical condition. (*Id.*) Mr. Mathis was later pronounced dead at the hospital.

The Macomb County Medical Examiner stated that Mr. Mathis's cause of death was anoxic encephalopathy and related complications due to acute subdural hematoma. (ECF No. 70-11, Autopsy Report, PageID.719.)[3] The medical examiner

---

[3] "Anoxic encephalopathy, or hypoxic-ischemic brain injury, is a process that begins with the cessation of cerebral blood flow to brain tissue, which most commonly results from poisoning (for example, carbon monoxide or drug overdose), vascular injury or insult, or cardiac arrest." *See* https://pubmed.ncbi.nlm.nih.gov/30969655/#:~:text=Anoxic%20encephalopathy% 2C%20or%20hypoxic%2Dischemic,or%20insult%2C%20or%20cardiac%20arrest [https://perma.cc/5T3A-MMMN]. A "subdural hematoma" is a type of bleed which occurs within the skull but outside the actual brain that is usually caused by a head injury.    https://my.clevelandclinic.org/health/diseases/21183-subdural-hematoma [https://perma.cc/62UX-TF3V].

found no external signs of injury, except for injuries related to attempted resuscitation. (*Id.* PageID.720-24.) There was also no trauma to Mr. Mathis's scalp or to his brain's dura matter, but the "left cerebral hemisphere is covered by clotted acute subdural hemorrhage." (*Id.*)

### B. Procedural History

On March 31, 2021, Plaintiff Shatia S. Mathis, as Personal Representative of the Estate of William Mathis, brought this action against the following defendants: (1) Nurse Cynthia McInnis; (2) Nurse Erin Byrne; (3) PA Kim Farris; (4) Corizon Health Inc.; (5) Quality Correctional Care of Michigan, P.C.; and (6) John Doe Medical Providers. (ECF No. 1, Complaint) Plaintiff asserted an Eighth Amendment deliberate indifference claim against Defendants and a *Monell* claim against the Corizon defendants.

On August 18, 2021, Plaintiff filed her First Amended Complaint against the same Defendants and asserting the same claims. (ECF No. 33, FAC.)[4]

---

[4] The Court notes that on February 20, 2023, Corizon filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Case No. 23-90086 (CML)). *See* ECF No. 282. Corizon's bankruptcy filing operates as an automatic stay as to the claims against it. *Id.*; 11 U.S.C. § 362(a). Accordingly, the continuation of a judicial action or proceeding against Corizon is halted until the automatic stay is lifted. 11 U.S.C. § 362(a). On February 24, 2023, this Court administratively stayed proceedings as to Defendant Corizon only. (ECF No. 58.)

On July 10, 2023, Defendant Cynthis McInnis filed the instant Motion for Summary Judgment seeking dismissal of Plaintiff's Eighth Amendment deliberate indifference claim against her. (ECF No. 70, Def. Mot.) Plaintiff filed a Response in opposition to McInnis's Motion for Summary Judgment (ECF No. 76), and McInnis filed a Reply brief. (ECF No. 79.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is material if its resolution will affect the outcome of the lawsuit." *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

---

On March 24, 2023, the Court entered an Order staying the case as to Defendant Farris (a Corizon employee) for 90 days and granting counsel's motion for withdrawal of attorney to Defendant Farris but denying that motion to withdraw as counsel as to Defendant Corizon. (ECF No. 68.) Then on March 27, 2023, the Court entered a Stipulated Order Staying the Case as to all Parties for 90 Days from March 24, 2023. (ECF No. 69.) That stay expired on June 22, 2023.

Defendant Farris is currently proceeding *pro se*, and neither Defendant Farris nor Defendant Byrne have filed motions for summary judgment in this case.

However, no genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, if the nonmoving party will bear the burden of proof on a claim, the movant "need only demonstrate that the nonmoving party has failed to 'make a showing sufficient to establish the existence of an essential element' of that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322). Thereafter, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[T]he non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009). Ultimately, the Court evaluates "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[The] general rule [is] that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (quotation marks omitted)).

## III.  ANALYSIS

Plaintiff claims that Defendant McInnis was deliberately indifferent to Mr. Mathis's serious medical needs and that her failure to adequately care for Mr. Mathis and to timely chart her assessment of him resulted in his death.

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An Eighth Amendment deliberate indifference claim has two components, one objective – a "'sufficiently serious' medical need" – and the other subjective – a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). "The plaintiff must show both that the alleged wrongdoing was objectively harmful enough to establish a

14

constitutional violation and that the official acted with a culpable enough state of mind, rising above gross negligence." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

Specifically, the objective component asks whether the prisoner faced a risk of sufficiently serious harm. *Farmer*, 511 U.S. at 834 (noting that "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'"); *see also Blackmore*, 390 F.3d at 895. To prove this objectively serious harm, a prisoner must first establish that he or she has "serious medical needs," *Estelle*, 429 U.S. at 106, and, if the prisoner has received some care for that serious medical need and he seeks redress based on the inadequacy of that care, he must show that such care was "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable as to fundamental fairness." *Rhinehart*, 894 F.3d at 737 (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). "This will often require 'expert medical testimony ... showing the medical necessity for' the desired treatment and 'the inadequacy of the treatments' the inmate received." *Id.* at 737-38 (citations omitted).

Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that

he then disregarded that risk." *Comstock*, 273 F.3d at 702. "But mere malpractice does not violate the Eighth Amendment." *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (citing *Estelle*, 429 U.S. at 106); *Rhinehart*, 894 F.3d at 738 ("A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.").

In addition, because § 1983 does not permit a plaintiff to impose vicarious liability on a defendant for another defendant's actions, a plaintiff must independently establish these objective and subjective elements for each medical provider he sues. *Phillips*, 14 F.4th at 536.

## A. The Objective Component – Serious Medical Need

### 1. Whether Mr. Mathis suffered from an objectively serious medical need at the time McInnis examined him

To prove objectively serious harm in the health context, prisoners must first establish that they suffered an objectively "serious medical need." *Phillips*, 14 F.4th at 534 (citing *Estelle*, 429 U.S. at 106). "They can do so, for example, by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care." *Id.* (citing *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013)); *see also, e.g., Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 567 (6th Cir. 2020) (finding the plaintiff who

suffered two seizures at the jail and a third after being transferred to the hospital suffered from a sufficiently serious medical condition).

McInnis argues that Mr. Mathis had no signs of any significantly serious medical needs at the time he was being examined and treated by her early in the morning of June 22, 2018. *See Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (explaining that the court assesses the medical need that the plaintiff experienced *at the time the defendant took the challenged actions*). McInnis argues that the evidence shows that she rushed to aid Mr. Mathis when he fell, and that she found a patient with no outward signs of injury, normal vital signs, and no signs of neurological impairment. Mr. Mathis initially refused treatment and denied any pain or head injury. (ECF No. 70-6, Def. McInnis Dep. at pp. 42-43, 84, PageID.623-24, 665) (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.714.) McInnis argues that it was not obvious that Mr. Mathis needed any further care at the time she treated him. In fact, when a medical provider did examine Mr. Mathis almost five hours later, and after Mr. Mathis reported possibly a second fall, that provider still found no evidence of a sufficiently serious medical need. (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.712-13) (ECF No. 70-15, Excerpt from Critical Incident Report MRF-096-18, PageID.1024.)

Plaintiff asserts that Mr. Mathis had a long list of serious medical conditions, including taking Coumadin, a blood thinner, and that a fall impacting Mr. Mathis's head would immediately demand serious medical attention. Plaintiff contends that being at risk for brain bleeds because of taking Coumadin alone creates a serious medical condition. Plaintiff argues that McInnis had knowledge of Mr. Mathis's health condition and the severity of his fall in the healthcare lobby and that "it is obvious that [Mr. Mathis] had a sufficiently serious medical condition in which a hard fall impacting the head could exacerbate his already serious medical conditions." (ECF No. 76, Pl. Resp., PageID.1073.)

Plaintiff contends that her expert testified that trauma to the head requires an immediate CT scan to accurately diagnose a head injury, citing to the deposition testimony of Physician Assistant James Van Rhee. (ECF No. 76, Pl. Resp., PageID.1072, citing ECF No. 76-3, Deposition of Pl. Expert PA James Van Rhee, at p. 81, PageID.1205.) However, Van Rhee is a Physician Assistant, not a nurse, and he expressly stated in his deposition that he did not make "any comments, or have any opinions about what the RNs did in this case related – to discuss anything about the standard of care or anything that a nurse should have done now in this situation." (ECF No. 76-3, Pl. Expert PA Van Rhee Dep. at p. 104, PageID.1211.)

18

Thus, his opinion is not relevant to whether any nurse's treatment of Mr. Mathis, including McInnis's treatment, was appropriate, or within the standard of care.

And in any event, as discussed above, McInnis testified that Mr. Mathis denied he struck his head, he had no apparent signs of injury, and he did not complain to her of a headache or nausea. Van Rhee testified that he would not order a CT scan under these circumstances: "I've taken care of lots of patients who have fallen who are on Coumadin. And unless they can absolutely tell me for sure that there's no head trauma, that they didn't hit their head, they don't complain of a headache, then you – You know,   I tripped and fell on my bed. Okay, I probably don't need to CT your head. I tripped and fell *and now I have a headache*, you need a CT of your head." (*Id.* at p. 78, PageID.1205 (emphasis added).) Van Rhee further explained that for brain bleeds, "you're looking for headache. You're looking for change in mental status. You're looking for things like nausea and vomiting, … you're looking for changes in pupil area response, … maybe change in vital signs, problems with blood pressure, pulse, other neurological. They may complain of weakness." (*Id.* at p. 72, PageID.1203.) There is no evidence that Mr. Mathis exhibited any of those signs when McInnis evaluated him on the morning of June 22, 2018 – he did not complain of a headache or nausea, his vital signs were within normal limits, and he had no apparent signs of injury.

19

Plaintiff argued for the first time at the hearing on Defendant's motion for summary judgment that the Sixth Circuit Court of Appeals has routinely held that a condition resulting in death is sufficiently serious to meet the objective component of an Eighth Amendment deliberate indifference claim, citing *Burwell v. City of Lansing, Michigan*, 7 F.4th 456 (6th Cir. 2021), and that because Mr. Mathis died, he had a serious medical condition. However, *Burwell* is inapposite to this case. In *Burwell*, the court did not find the existence of a serious medical condition on the sole fact that the prisoner died. Rather, the court found that the prisoner exhibited clear and undeniable signs of medical distress associated with overdosing before he died that would be obvious to a lay person that the prisoner had a serious medical need, including being "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly," with a pool of vomit forming around his head. *Id.* at 464. There is no evidence in this case that, at the time McInnis treated Mr. Mathis, he exhibited *any* signs or symptoms associated with a head injury or any other clear and undeniable signs of medical distress.

Rather, this case is more like *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009), which is distinguished in *Burwell*, where the court found that the plaintiffs failed to establish a sufficiently serious medical need when the detainee, who subsequently

20

died, was examined. Specifically, medical personnel examined the overdosing detainee and determined that he exhibited no signs of visible distress from crack cocaine use, other than hallucinations. *Id.* at 254-55. The court found that, based on the lack of outward signs of distress and the conclusions of medical personnel who determined that the detainee did not need to go to the hospital, that the plaintiff failed to establish an objectively serious medical need because such need "was not obvious to trained medical personnel." *Id.* at 255.

The Court finds that Plaintiff has not demonstrated why it would be obvious to medical personnel or a lay person that Mr. Mathis needed to be treated for a concussion or brain bleed based on his symptoms (or more aptly lack thereof) when assessed by McInnis on the morning of June 22, 2018, or that McInnis's knowledge of Mr. Mathis's pre-existing health conditions and medications, coupled with a fall, is enough to establish that Mr. Mathis suffered from an objectively sufficient serious medical condition at the time he was assessed by McInnis. As discussed *supra*, it is undisputed that McInnis promptly evaluated Mr. Mathis after his fall and that she found no signs or symptoms of any injury or other serious medical condition. Plaintiff has not offered any evidence to the contrary.

In addition, both Plaintiff's and Defendant McInnis's nurse medical experts opined that McInnis had no reason to believe that Mr. Mathis had a serious medical

21

problem at the time she provided treatment to him. Specifically, Plaintiff's expert, Valerie Tennessen, R.N., agreed that, when McInnis examined Mr. Mathis on June 22, 2018, there were no external signs of head injury or brain trauma or other injury, Mr. Mathis's vital signs were all within normal limits, and there was nothing that would indicate the existence of any serious medical problem. (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at pp. 55-56, PageID.509-10 (agreeing that there was "nothing that would indicate … the existence of any serious medical problem" at the time McInnis assessed Mr. Mathis).) Similarly, Defendant's expert, Kathryn Wild, R.N., opined that when McInnis assessed Mr. Mathis, his vital signs were within the normal range, his neuro exam was within normal limits, he had no complaints of pain, there was no evidence of head trauma or concussion, and McInnis's assessment was within the standard of care. (ECF No. 70-4, Def. Expert R.N. Wild Report, PageID.575-76.)

These expert opinions further this Court's finding that there is no evidence that Mr. Mathis suffered a sufficiently serious medical condition at the time McInnis treated him on June 22, 2018. *See Spears*, 589 F.3d at 255; *see also Wagle v. Corizon*, No. 19-13787, 2023 WL 2749147, at *6-7 (E.D. Mich. Mar. 31, 2023) (finding that even though plaintiff suffered visible injuries sustained in a fight with another prisoner, including a purple and swollen left eye, bumps and scratches, a

sore face, hurt nose, and headache, for which he received treatment, that evidence does not demonstrate that it was obvious the plaintiff needed treatment for a concussion) (citing *Jones v. Wardlow*, No. 3:08–cv–545–TLS, 2013 WL 6629334, at *2 (N.D. Ind. Dec. 17, 2013) (finding a reasonable jury could not conclude that plaintiff, who was injured after he was attacked by other prisoners, suffered from an objectively serious medical condition when he did not "presen[t] any evidence that he was actually displaying signs and symptoms of a concussion or internal injuries" and, instead, displayed swelling, a cut on his face, and small lacerations on his head—which were "not so obviously serious that even a lay person would easily recognize the need for medical attention"); *Estate of Clutters v. Sexton*, No. 1:05cv223, 2007 WL 3244437, at *13 (S.D. Ohio Nov. 2, 2007) (finding that there was nothing obvious about the plaintiff's condition that would have indicated that his head injury needed medical treatment when prison officials testified that the plaintiff was alert after falling and hitting his head and when a paramedic testified that the cut on the back of his head stopped bleeding, the cut did not need stiches, and plaintiff was alert during his examination)). Accordingly, Defendant McInnis is entitled to summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim.

23

However, even if the Court did find that Mr. Mathis suffered an objectively serious medical need at the time McInnis assessed him on June 22, 2018, as discussed next, Plaintiff would still need to offer medical evidence that the care McInnis provided was grossly inadequate to satisfy the objective component of Plaintiff's Eighth Amendment deliberate indifference claim.

### 2. Whether the care McInnis provided to Mr. Mathis on June 22, 2018 was objectively grossly incompetent or grossly inadequate

As discussed above, the undisputed evidence shows that Mr. Mathis received care from Defendant McInnis following his fall in the health care lobby on June 22, 2018. Indeed, Plaintiff contends that Mr. Mathis received inadequate treatment, not that he received no treatment at all. (ECF No. 76, Pl. Resp., PageID.1073 (stating Mr. Mathis "does not allege Nurse McInnis failed to treat him[.]").) Thus, even if Plaintiff could establish that Mr. Mathis suffered an objectively serious medical need at the time McInnis examined him, Plaintiff cannot rely on Mr. Mathis's alleged serious medical needs alone to establish the objective element of his deliberate indifference claim. *See Phillips*, 14 F.4th at 536. Instead Plaintiff must show that McInnis provided care that was "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness." *See Rhinehart*, 894 F.3d at 737 (citation omitted). This generally requires expert medical

24

testimony "showing the medical necessity for the desired treatment and the inadequacy of the treatments the [plaintiff] received." *Id*. at 737-38; *see also Phillips*, 14 F.4th at 535 ("Phillips needed to present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so.").

McInnis argues that, even if Plaintiff could show that Mr. Mathis's need for additional or different treatment was obvious at the time McInnis saw him, Plaintiff still cannot show that McInnis's alleged conduct was serious enough to violate the Constitution. McInnis asserts that the expert medical evidence in this case confirms that she acted appropriately when she examined Mr. Mathis following his fall on June 22, 2018. Plaintiff's RN Expert Tennessen testified that aside from McInnis's failure to timely chart her assessment of Mr. Mathis, McInnis did not violate her standard of care when examining Mr. Mathis after he fell on June 22, 2018. (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at pp. 49-50, PageID.503-04.) Tennessen opined that McInnis performed the appropriate assessment, provided appropriate care, and provided appropriate patient instruction to Mr. Mathis. (*Id.* at pp. 42-50, PageID.496-504.) And while Tennessen contends that she believed McInnis's failure to timely chart her assessment of Mr. Mathis on June 22, 2018, did not meet the standard of care for an R.N., she further opines that such failure to chart did not

impact Mr. Mathis's later treatment by Defendants RN Byrne or PA Farris or affect his overall outcome. (*Id.* at pp. 63-64, PageID.517-18.). Tennessen thus did not testify that McInnis's failure to timely chart her assessment of Mr. Mathis had a detrimental effect on his care, or that McInnis's care of Mr. Mathis, or her failure to timely chart her assessment of him, constituted grossly incompetent or inadequate treatment of Mr. Mathis. *See Phillips*, 14 F.4th at 538-39 (stating that the plaintiff "needed to 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment'") (quoting *Santiago*, 734 F.3d at 590).

While Defendant McInnis's expert RN Wild opined,` contrary to Plaintiff's expert Tennessen, that "[l]ate chart entries are an accepted practice and do not indicate a deviation from the standard of care," she agreed with Plaintiff's expert that "[t]he late entry note authored by RN McInnis had no impact on the care provided to Mr. Mathis on the date of his accident." (ECF No. 70-3, RN Wild Report, PageID.575-76.)

In addition, Defendants Byrne and Farris testified that the lack of a chart note by McInnis for Mr. Mathis did not affect their ability to assess and triage Mr. Mathis when they saw him later that morning, and that he informed them that he had suffered a fall. (ECF No. 70-12, Def. Byrne Dep. at p. 94, PageID.825 (stating that

26

the absence of a chart note from McInnis did not "affect [Byrne's] ability to assess and triage Mr. Mathis when [she] did so at 11:00 that morning")) (ECF No. 70-13, Def. Farris Dep. at p. 87, PageID.972 (agreeing that "the fact that [she] was unaware that [Mr. Mathis] had fallen earlier in that morning" did not "affect [her] care and treatment of [Mr. Mathis].").)

Moreover, McInnis testified that she verbally told incoming staff about Mr. Mathis's fall and asked the incoming nurses, specifically including Defendant Byrne, to check on Mr. Mathis, (ECF No. 70-6, Def. McInnis Dep. at pp. 45, 63, PageID.626, 644), lending further support to a finding that McInnis's failure to timely chart her assessment did not affect Mr. Mathis's treatment or outcome in this case and was not "grossly incompetent" or grossly "inadequate." *See Rhinehart*, 894 F.3d at 737. Plaintiff acknowledged in the Response brief that "Nurse McInnis … told Nurses Erin Byrne and Monika Thompson to watch Mr. Mathis because he fell." (ECF No. 76, Pl. Resp., PageID.1064.) While Defendant RN Byrne does not specifically recall this interaction, she does not deny that it occurred. (ECF No. 70-12, Def. Byrne Dep. at pp. 93-94, PageID.824-25.) Plaintiff's expert agreed that verbal reporting to incoming staff is within the normal practice in an institutional setting. (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at p. 52, PageID.506.)

The Court finds, taking all the evidence in the light most favorable to Plaintiff, that Plaintiff has failed to show that McInnis's treatment of Mr. Mathis, including her failure to immediately chart her assessment of Mr. Mathis, was so "grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness." *See Rhinehart*, 894 F.3d at 737. Plaintiff has not met her burden to show that there is a factual dispute as to whether Mr. Mathis displayed obvious signs of a brain bleed to McInnis or whether there was a detrimental effect of any delay in treatment because McInnis did not timely chart her assessment of Mr. Mathis. Rather, the medical evidence shows that McInnis's assessment of Mr. Mathis was proper and her failure to timely chart her assessment of Mr. Mathis did not impact his later treatment by Defendants Byrne or Farris or have a detrimental effect on his health or outcome. (ECF No. 70-12, Def. Byrne Dep. at p. 94, PageID.825) (ECF No. 70-13, Def. Farris Dep. at p. 87, PageID.972) (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at pp. 63-64, PageID.517-18.)

Accordingly, Plaintiff has failed to meet the objective prong of his Eighth Amendment deliberate indifference claim against Defendant McInnis, and that claim is dismissed with prejudice. *Phillips*, 14 F.4th at 535; *Wagle*, 2023 WL 2749147, at *8 & n.10 (collecting cases examining claims in which a plaintiff received some treatment for visible injuries and did not put forth evidence suggesting that he or she

was harmed by a failure to diagnose or treat a concussion and finding that the plaintiff could not establish a serious medical need).

### B. Subjective Component – Sufficiently Culpable State of Mind

Even if Plaintiff could satisfy the objective prong of the Eighth Amendment deliberate indifference claim against Defendant McInnis, the Court would still be required to consider the subjective prong of the deliberate indifference test. *See Phillips*, 14 F.4th at 535. "This part asks: Did the official know of and disregard the serious medical need?" *Id.* (citing *Farmer*, 511 U.S. at 834, 838-39). Evidence showing an accidental harm does not suffice; rather "[a]n official must cause the harm with a sufficiently culpable mental state – in this context, criminal recklessness." *Id.* (citations omitted). "In this healthcare setting, a [nurse] must first know of the facts that show the serious medical need and must personally conclude that this need exists. The [nurse]'s response next must 'consciously disregard[]' the need." *Id.* (internal and end citations omitted); *see also Rhinehart*, 894 F.3d at 738 ("This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, and that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it.") (quoting *Comstock*, 273 F.3d at 703).

29

"A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart*, 894 F.3d at 738 (quoting *Farmer*, 511 U.S. at 842). But "[a] [medical provider's] errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Id*. Accordingly, "[w]here the plaintiff has received some medical treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Burgess*, 735 F.3d at 477 (citation omitted); *Rhinehart*, 894 F.3d at 738 ("[W]hen a claimant challenges the adequacy of an inmate's treatment, 'this Court is deferential to the judgments of medical professionals.'") (citation omitted). However, "[a] plaintiff can nevertheless satisfy this [subjective] standard by demonstrating that a medical professional 'consciously expos[ed] the patient to an excessive risk of serious harm' in administering treatment, or rendered medical care 'so woefully inadequate as to amount to no treatment at all." *Griffith*, 975 F.3d at 568 (internal and end citations omitted).

McInnis argues that Plaintiff cannot meet this burden.

### 1. Whether McInnis was aware, or should have been aware, of any serious medical need of Mr. Mathis

Defendant McInnis argues that there is no evidence that she knew of and consciously disregarded a serious medical need of Mr. Mathis on June 22, 2018. Plaintiff responds that McInnis knew or should have known that Mr. Mathis was at a high risk of a brain bleed following his fall that required immediate medical attention.

The Court agrees with Defendant McInnis. There is no evidence that McInnis knew or suspected that Mr. Mathis may be suffering from a brain bleed or other serious medical condition and yet failed to act. McInnis provided Mr. Mathis with prompt medical treatment immediately after his fall, she conducted a thorough assessment which revealed no adverse findings, and she provided Mr. Mathis proper patient instruction. McInnis also points out that even four hours after she assessed Mr. Mathis, when he was assessed by Defendants Byrne and Farris, his vital signs were still normal, he still had no external signs of injury, his pupils were normal and responsive to light, he was alert and oriented, and he denied nausea and dizziness. And further, there were no signs of external injury on Mr. Mathis at the time of his autopsy four days later.

In addition, Plaintiff's RN Expert Tennessen acknowledges that McInnis had no reason to believe that Mr. Mathis had a serious medical problem at the time she was treating him on June 22, 2018, and Tennessen opined that other than McInnis's late charting, her treatment of Mr. Mathis was appropriate under the circumstances. (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at pp. 42-50, 55-56, PageID.496-504, 510-11.) Defendant's RN Expert Wild agrees. (ECF No. 70-3, Def. Expert RN Wild Report, PageID.575-76.) In fact, both Plaintiff's and Defendant's RN experts opined that McInnis was not deliberately indifferent to Mr. Mathis's medical needs on June 22, 2018. (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at p. 99, PageID.553) (ECF No. 70-3, Def. Expert RN Wild Report, PageID.576.)

The Court finds that Plaintiff has not presented sufficient evidence from which a reasonable jury could find that Defendant McInnis was subjectively aware that Mr. Mathis suffered from a brain bleed or other serious medical condition at the time she treated him on June 22, 2018.

## 2. Whether McInnis consciously disregarded Mr. Mathis's medical needs

McInnis further argues that, viewing the evidence in the light most favorable to Plaintiff, Plaintiff cannot show that McInnis knowingly disregarded Mr. Mathis's medical needs. McInnis points to evidence that she rushed to Mr. Mathis's aid when

she saw him fall, and that he initially refused assistance. (ECF No. 70-6, Def.
McInnis Dep. at pp. 37-40, PageID.618-21) (ECF No. 70-7, Video at 6:18-6:20 a.m.)
McInnis however convinced Mr. Mathis to allow her to examine him, and upon
examination she saw no signs of an injury, bumps, bruises, etc., he was able to move
his extremities freely, his pupils were normal and reactive, his vital signs were within
normal limits, and he did not exhibit signs and symptoms of head trauma such as
upset stomach, nausea or vomiting. (ECF No. 70-6, Def. McInnis Dep. at pp. 40-42,
53-55, PageID.621-23, 634-36.) McInnis instructed Mr. Mathis to come back to
healthcare if he suffered any symptoms, including becoming tired, nauseated, or
wanting to vomit, and that he should use his wheelchair for the remainder of the day.
(*Id.*) McInnis argues that Plaintiff therefore has no evidence proving the subjective
prong of deliberate indifference.

Plaintiff argues in Response that McInnis knew that there was a potential for
brain bleeding because of Mr. Mathis's fall since she was familiar with his health
condition, and she told him to come back to healthcare if he gets a headache or
vomits. Plaintiff asserts that Mr. Mathis did report back to healthcare when he
developed a headache, but still was not properly assessed with a brain bleed at that
second time, in part because McInnis had failed to properly document Mr. Mathis's

fall earlier that morning and thus the subsequent assessors did not know that Mr. Mathis had hit his head hours earlier.

The Court finds that Plaintiff has failed to present any evidence that McInnis consciously disregarded Mr. Mathis's medical needs or recklessly failed to take more aggressive steps in monitoring him, such as by pursuing a CT scan. As discussed *supra*, McInnis testified that the signs and symptoms she witnessed did not support a more aggressive course of action, and "courts are generally reluctant to second guess the medical judgment of prison medical officials." *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014). And even if McInnis was negligent in failing to take more aggressive steps, that would only constitute a claim of medical malpractice that lies beyond the Constitution's reach, because "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Winkler v. Madison Cnty.*, 893 F.3d 877, 891, 892-93 (6th Cir. 2018) (citation omitted) ("Although [the defendant's] assessment and treatment of [the prisoner] might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to [the prisoner's] health."). "[A]llegations that more should have been done by way of diagnosis and treatment and

34

suggest[ions] of other options that were not pursued raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim." *Rhinehart*, 894 F.3d at 741 (punctuation modified); *see also Griffith*, 975 F.3d at 574 ("The decision to elevate [plaintiff's] results via the weekly [call] list rather than call an [advanced practice registered nurse] directly may be evidence that [defendant nurse] underestimated the severity of [plaintiff's] condition, but it does not demonstrate that she 'recklessly failed to act with reasonable care to mitigate [the] risk,' or that she should have known that his medical condition was declining.") (internal and end citations omitted); *Wagle*, 2023 WL 2749147, at *9-10 (collecting cases in which the plaintiffs alleged a failure to adequately treat a concussion, and the courts granted summary judgment to defendant nurses who provided prompt treatment for the plaintiffs but found nothing at the time of their examination to indicate that the plaintiffs were suffering from a more serious condition).

As for McInnis's failure to timely chart her examination of Mr. Mathis, Plaintiff's own expert testified that this failure to chart did not impact Mr. Mathis's subsequent treatment by other medical providers or his outcome. (ECF No. 70-2, Pl. Expert RN Tennessen Dep. at pp. 42-50, 63-64, PageID.496-504, 517-18 (opining that McInnis's failure to timely chart her assessment of Mr. Mathis did not affect his overall outcome and would not have impacted the assessments by RN Byrne or PA

Farris).) Defendants Byrne and Farris similarly testified that McInnis's failure to timely chart her assessment of Mr. Mathis did not impact their subsequent assessment of Mr. Mathis, who had in fact told them he had suffered a fall. (ECF No. 70-12, Def. Byrne Dep. at p. 94, PageID.825 (stating that the absence of a chart note from McInnis did not "affect [Byrne's] ability to assess and triage Mr. Mathis when [she] did so at 11:00 that morning")) (ECF No. 70-13, Def. Farris Dep. at p. 87, PageID.972 (agreeing that "the fact that [she] was unaware that [Mr. Mathis] had fallen earlier in that morning" did not "affect [her] care and treatment of [Mr. Mathis].").)

Further, while some courts "have recognized that inadequate, inaccurate, and unprofessionally maintained medical records create 'a grave risk of unnecessary pain and suffering in violation of the Eighth Amendment," courts have generally found that "Eighth Amendment violations stemming from inadequate, incomplete, or inaccurate, or mislaid medical documents are typically reserved for claims alleging systemic inadequacies in a jail's or prison's systems of medical record keeping," and not a failure to document an examination on one instance. *See Davis v. Caruso*, No. 07-cv-11740, 2009 WL 878193, at *2 (E.D. Mich. Mar. 30, 2009) (collecting cases and finding no deliberate indifference where plaintiff alleged an omitted record from a procedure led to an unnecessary biopsy and the postponement of cancer treatment

36

but failed to establish how the failure gave rise to a grave risk of unnecessary pain and suffering); *see also Anderson v. Hall*, No. 5:19-cv-6, 2020 WL 2896682, at *3 (S.D. Ga. May 29, 2020) (finding that the medical provider's failure to document plaintiff's knee pain, without more, is insufficient to state a claim for deliberate indifference), *report and recommendation adopted by* 2020 WL 3406329 (S.D. Ga. June 19, 2020); *Beene v. Rasseki*, No. 3:10-0285, 2010 WL 2196597, at *7 (M.D. Tenn. May 27, 2010) (finding plaintiff failed to state an Eighth Amendment claim based on errors in his medical records, in part, because he failed to allege systematic inadequacies in the prison's recordkeeping). Further, it is well settled in the Sixth Circuit that "'failure to follow internal policies, without more,' does not equal deliberate indifference." *Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022) (quoting *Winkler*, 893 F.3d at 891).

The Court finds that Plaintiff has failed to present any evidence from which a reasonable jury could find that Defendant McInnis was subjectively aware that Mr. Mathis suffered from a brain bleed or other serious condition and chose to consciously ignore his need for treatment, and thus that McInnis acted with deliberate indifference on that occasion. Defendant McInnis therefore is entitled to summary judgment on Plaintiff's Eighth Amendment claim against McInnis and that claim is dismissed with prejudice.

37

## C. Qualified Immunity

McInnis argues alternatively that she is entitled to qualified immunity on Plaintiff's Eighth Amendment claim against her because the summary judgment evidence demonstrates that she has not violated Mr. Mathis's constitutional rights and Plaintiff cannot show that McInnis has violated any clearly established right of which a reasonable person would have known.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine "shields 'government officials performing discretionary functions' from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Qualified immunity thus balances "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield

officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Although a defendant ordinarily bears the burden of proof for an affirmative defense, where a defendant raises the defense of qualified immunity, the plaintiff "bears the burden of showing that [the] defendant[ ] [is] not entitled to qualified immunity." *Gavitt v. Born*, 835 F.3d 623, 641 (6th Cir. 2016) (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). Thus, in opposing a defendant's claim of qualified immunity, a plaintiff must show: (1) the defendant violated a constitutional right based on the facts alleged, and (2) that the right was clearly established. *Plumhoff v. Rickard*, 572 U.S. 765, 773-74 (2014); *Pearson*, 555 U.S. at 232. The district court may address the qualified immunity analysis in any order. *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016). If the plaintiff is unable to establish the violation of a constitutional right, the Court's inquiry ends, and the defendant is entitled to immunity. *Perez v. Oakland Cnty.*, 466 F.3d 416, 426-27 (6th Cir. 2006). However, even if the plaintiff establishes a constitutional violation, he still bears the burden of showing that the constitutional right was clearly established at the time of the violation. *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 765 (6th Cir. 2021).

### 1.  Whether there is a constitutional violation

The Court finds that because, as discussed above, the record does not establish that Defendant McInnis's conduct in this case constitutes a violation of Mr. Mathis's Eighth Amendment rights, Plaintiff cannot defeat McInnis's qualified immunity defense. McInnis is therefore entitled to qualified immunity for Plaintiff's § 1983 deliberate indifference claim under the Eighth Amendment. *See Perez*, 466 F.3d at 426-27 (citing *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 771 (6th Cir. 2005)).

### 2.  Whether McInnis violated a clearly established constitutional right

Turning to whether Plaintiff can establish that McInnis violated a clearly established constitutional right, Plaintiff contends in her Response brief that Mr. Mathis had a clearly established right to receive medical treatment when there are known medical needs. However, the United States Supreme Court has cautioned that courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Plumhoff*, 572 U.S. at 778-79). Indeed, a court's task "requires a high 'degree of specificity,'" *id.* (quoting *Mullenix v. Luna*, 577 U.S. 7,

13 (2015)), so that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). Plaintiff's proposed clearly established right is patently too general.

Further, the law requires Plaintiff to point to a proper case showing that a reasonable nurse would have known that her actions were unconstitutional under the specific circumstances she encountered. *See Saucier*, 533 U.S. at 201-02; *see also Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993-94 (6th Cir. 2017) (finding that officers were entitled to qualified immunity on a deliberate indifference claim because the plaintiff had not pointed to a case requiring them to do more than they did). When determining whether an individual's rights are clearly established for purposes of qualified immunity, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013).

Plaintiff cites to only one case in the Response brief, *Greco v. Livingston County*, 774 F.3d 1061 (6th Cir. 2014). However, *Greco* is an excessive force case against a sheriff's deputy in which the deputy allegedly "sicked" his trained police dog on the plaintiff. *Id. Greco* in no way would inform McInnis that her conduct in

41

assessing and treating Mr. Mathis after he fell, but failing to immediately chart her assessment, violated Mr. Mathis's constitutional rights. *Mullenix*, 577 U.S. at 12 (1987) (the court must consider "'whether the violative nature of *particular* conduct is clearly established' … 'in light of the specific context of the case, not as a broad proposition.'") (citations omitted).

McInnis asserts that the proper question here is whether it would be clear to a reasonable nurse that failing to immediately place written treatment notes in a chart, after verbally notifying oncoming staff of concerns about a particular patient, clearly violates a prisoner's constitutional rights. (ECF No. 79, Def. Reply, PageID.1563.) Plaintiff failed to offer any case showing that a reasonable nurse in McInnis's position would have known her actions in rendering care to Mr. Mathis after he fell but failing to timely chart her assessment of him was unconstitutional under the specific circumstances of this case. Defendant McInnis's counsel asserts that he was unable to find a single case in any federal circuit that found that a delay in charting demonstrates deliberate indifference. The Court has similarly failed to find such a case.

The Court notes, as discussed *supra*, that "Eighth Amendment violations stemming from inadequate, incomplete, or inaccurate, or mislaid medical documents are typically reserved for claims alleging systemic inadequacies in a jail's or prison's

systems of medical record keeping," and not a failure to document an examination on one instance. *See Davis*, 2009 WL 878193, at *2 (collecting cases); *see also Thomas v. Southern Health Partners, Inc.*, No. 2:21-cv-012, 2023 WL 3935047, at *21 (E.D. Ky. June 9, 2023) (nurse who created a treatment note almost one month after the incident date cannot be liable for deliberate indifference because plaintiff did not establish how the nurse was or should have been aware of plaintiff's serious medical need at that time, and the nurse's failure to comply with policy does not equate to a per se constitutional violation); *id.* at *25 (finding that a nurse's post hoc deletion or alteration of plaintiff's medical records "is not evidence from which a reasonable jury could find that [the nurse] acted with deliberate indifference while she was responsible for [plaintiff's] medical care" because that fact "does not establish that [the nurse's] prior treatment of [plaintiff] had been deliberately indifferent").

Accordingly, because Plaintiff cannot show that a reasonable nurse in Defendant McInnis's position would have known that late charting would have violated a prisoner's constitutional rights, the Court finds that McInnis is entitled to qualified immunity for this reason as well.

43

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant Cynthia McInnis's Motion for Summary Judgment and **DISMISSES** Plaintiff's claim against Defendant McGinnis **WITH PREJUDICE**.


IT IS SO ORDERED.

Dated: December 26, 2023

s/ Paul D. Borman
Paul D. Borman
United States District Judge