UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHATIA S. MATHIS, in her capacity
as the Personal Representative of the
Estate of WILLIAM MATHIS,

                Plaintiff,

v.

CYNTHIA McINNIS, ERIN BYRNE,
KIM FARRIS, CORIZON HEALTH,
INC., QUALITY CORRECTIONAL
CARE OF MICHIGAN, P.C., and
JOHN DOE MEDICAL PROVIDERS,

                Defendants.

_____/

Case No. 21-cv-10734

Paul D. Borman
United States District Judge

**OPINION AND ORDER**
**(1) GRANTING DEFENDANT ERIN BYRNE, RN'S MOTION FOR**
**SUMMARY JUDGMENT (ECF NO. 92) AND**
**(2) GRANTING DEFENDANT KIM FARRIS, PA'S MOTION FOR**
**SUMMARY JUDGMENT (ECF NO. 93)**

This is a prisoner civil rights case under 42 U.S.C. § 1983 arising from the

death of William Mathis, a former inmate of the Michigan Department of

Corrections. Plaintiff Shatia Mathis, as Personal Representative of the Estate of

William Mathis, brought this action against the following defendants: Registered

Nurse Cynthia McInnis, Registered Nurse Erin Byrne, Physician Assistant Kim

1

Farris, Corizon Health Inc., Quality Correctional Care of Michigan, P.C., and John Doe Medical Providers.

Now before the Court are Defendant Erin Byrne, RN's Motion for Summary Judgment (ECF No. 92) and Defendant Kim Farris, PA's Motion for Summary Judgment (ECF No. 93). Both motions have been fully briefed. The Court has determined that oral argument on Defendants' motions will not be necessary and will decide the matter on the parties' written submissions. E.D. Mich. L.R. 7.1(f)(2).

For the reasons set forth below, the Court GRANTS both motions for summary judgment.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.    Relevant Facts

#### 1.    The parties

On June 22, 2018, William Mathis was a prisoner incarcerated in the Michigan Department of Corrections' (MDOC) Macomb Correctional Facility (MRF) in Lenox Township, Michigan. (ECF No. 33, Plaintiff's First Amended Complaint (FAC) ¶¶ 5, 18) (ECF No. 89-3, MDOC OTIS Record, PageID.1783-85.) Mr. Mathis had a history of health problems for which he received treatment during his incarceration, including HIV, polyneuropathy due to drugs, hypertension, acute and chronic congestive heart failure, embolism and thrombosis (i.e., blood clots), chronic

2

obstructive pulmonary disease, and cirrhosis of the liver. (ECF No. 89-2, Deposition of Pl. RN Expert Valerie Tennessen, RN, at p. 35, PageID.1717) (ECF No. 89-4, Deposition of Def. Cynthia McInnis, RN, at pp. 32-33, PageID.1818-19.)

Defendant Cynthia McInnis is a Registered Nurse (RN), employed with the MDOC. (ECF No. 89-4, RN McInnis Dep. at p. 12, PageID.1798.) She was familiar with Mr. Mathis and was aware that he had several serious medical conditions, having provided him various medications and taking his blood pressure in the past, but she stated that he rarely required any type of emergent care. (*Id.* at pp. 31-32, PageID.1817-18.) On December 26, 2023, this Court granted Defendant RN McInnis's Motion for Summary Judgment and dismissed Mr. Mathis's claims against her with prejudice. (ECF No. 86, Opinion and Order.)

Defendant Erin Byrne, also a Registered Nurse, was employed with a staffing agency called Cell Staff and contracted to work for the MDOC during the time period relevant to this lawsuit. (ECF No. 89-5, Deposition of Def. Erin Byrne, RN, at pp. 19-20, PageID.1895-96.) She worked at MRF for about six months – from February through August of 2018, and was somewhat familiar with Mr. Mathis, having dispensed his medications to him in the past at the lunchtime medication line. (*Id.* at pp. 21, 36 PageID.1897, 1912.)

3

Defendant Kim Farris is a Physician Assistant (PA) employed at the MDOC's MRF facility since September 2021 through Grand Prairie Wellpath Agency, a corrections institution healthcare company contracted with the MDOC to provide medical care for MDOC inmates. (ECF No. 89-6, Deposition of Def. Kim Farris, PA, at pp. 9-10, PageID.2009-10.) However, during the time period relevant to this case, PA Farris was employed at the MRF through a different corrections healthcare provider, Defendant Corizon Healthcare, Inc., since approximately March 2017. (*Id.* at pp. 12, 27, PageID.2011, 2026.)[1] PA Farris had some experience treating Mr. Mathis during this time period, including treating him during the monthly Coumadin clinic at MRF, where she reviewed the patients' labs, ascertained medication compliance, and assessed symptoms, as well as treating him for chronic disease management. (*Id.* at pp. 27-29, 32, PageID.2026-28, 2031.)

---

[1] The Court notes that on February 20, 2023, Defendant Corizon Healthcare, Inc. a/k/a Quality Correctional Care of Michigan, P.C. (Corizon), filed a voluntary bankruptcy petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Case No. 23-90086 (CML)). *See* ECF No. 282. Corizon's bankruptcy filing operates as an automatic stay as to the claims against it. *Id.*; 11 U.S.C. § 362(a). Accordingly, the continuation of a judicial action or proceeding against Corizon is halted until the automatic stay is lifted. 11 U.S.C. § 362(a). On February 24, 2023, this Court administratively stayed proceedings as to Defendant Corizon. (ECF No. 58.)

### 2.    Mr. Mathis falls in the health center lobby on June 22, 2018

On Thursday and Friday, June 21-22, 2018, Defendant RN McInnis was working the "midnight shift" of 6:00 p.m. Thursday to 6:30 a.m. Friday in the MRF health center. (ECF No. 89-4, RN McInnis Dep. at p. 31, PageID.1817.) At approximately 6:18 a.m. that Friday, Mr. Mathis was in the MRF health center lobby waiting in line to obtain his morning medications. (*Id*. at p. 33, PageID.1819) (ECF No. 70-7, Video of healthcare lobby on June 22, 2018, at 6:18:18 a.m.) Mr. Mathis stumbled and fell and struck his shoulder on the ground and his head on a door as he fell. (ECF No. 89-4, RN McInnis Dep. at p. 34, PageID.1820) (ECF No. 70-7, Video at 6:18:29-30 a.m.).

RN McInnis, who had been performing medication-related blood pressure checks and administering insulin injections to awaiting prisoners that morning, saw Mr. Mathis fall. (ECF No. 89-4, RN McInnis Dep. at p. 34, PageID.1820.) RN McInnis stated that while it looked like Mr. Mathis's head "bumped against the wall," Mr. Mathis told her that he did not hit his head. (*Id*. at p. 35, PageID.1821.) She then saw that Mr. Mathis was being helped up by two corrections officers. (*Id*. at p. 37, PageID.1823) (ECF No. 70-7, Video at 6:18:35-6:19:23 a.m.) RN McInnis secured a wheelchair and helped place Mr. Mathis into the wheelchair, with the

assistance of another prisoner. (ECF No. 89-4, RN McInnis Dep. at p. 37, PageID.1823) (ECF No. 70-7, Video at 6:18:35-6:19:23 a.m.)

### 3.   RN McInnis's treatment of Mr. Mathis

RN McInnis then asked Mr. Mathis to come into the "emergency room" inside of medical services so she could assess him. (ECF No. 89-4, RN McInnis Dep. at p. 38, PageID.1894.) Mr. Mathis responded "Nope, I refuse. I'm going to chow. I'm going to chow. I am not coming back. I'm going." (*Id.* at pp. 38, 40, PageID.1824, 1826.) MDOC policy states that, outside of involuntary mental health treatment, a medical provider may not provide medical care to a prisoner if that prisoner does not provide consent. (ECF No. 89-11, MDOC PD 03.04.105 – Informed Consent to Medical Care, PageID.2142-45.) RN McInnis twice repeated her request to Mr. Mathis to assess him, stating: "Okay, I'll ask you again. Will you go get your medicine, stay in the wheelchair, go get your medicine and then come back and see me when you're done?" (ECF No. 89-4, RN McInnis Dep. at pp. 39-40, PageID.1826-27.) Mr. Mathis then agreed and was pushed into the "emergency room" by another prisoner a few minutes later, after receiving his morning medication. (*Id.* at p. 39, PageID.1826) (ECF No. 70-7, Video at 6:22–6:23 a.m.)

6

RN McInnis conducted an assessment of Mr. Mathis, including:

Neurological checks. I checked his head for bumps, bruises, open areas, abrasions, scratches, skin tears, anything. Palpated it with my hand with a rubber glove on, with my hand. I had him raise his arms and move them around, because he fell on his shoulder, put his arms above his head, arms down, arms out in front of him, checked his pupils which were, didn't indicate any kind of head trauma at that time. Assessed him for any kind of a head trauma, signs and symptoms like upset stomach, nausea, vomiting, and I took, and I gave him all the symptoms, you know, "You get tired, you start wanting to vomit and get nauseated, you'd better get back right over to Healthcare and notify us. "And I also took his blood pressure and I told him to do not get out of that wheelchair, use the wheelchair today.

(ECF No. 89-4, RN McInnis Dep. at pp. 42-43, PageID.1828-29.)

Mr. Mathis repeatedly told RN McInnis that he was okay, that he hit his shoulder and not his head, and that he was having no pain. (*Id.* at p. 84, PageID.1870.) RN McInnis found no visible signs of injury on Mr. Mathis – "[n]o open areas, bumps or bruises seen." (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.714.) All of Mr. Mathis's vital signs were normal, he was fully oriented to person, place, and time, and he spoke clearly. (*Id.*) His skin was appropriately warm and dry, and he was able to move all his extremities without pain. (*Id.*) Mr. Mathis did not want to remain in the healthcare center, and he left the healthcare center by

7

wheelchair. (ECF No. 89-4, RN McInnis Dep. at p. 62, PageID.1848.)[2] Before he left, RN McInnis instructed Mr. Mathis "to notify us if he had any changes in mentation, any signs of headache, dizziness, nausea, vomiting, [or] upset stomach," "to use the wheelchair the rest of the day, and if there's any changes to notify us immediately." (*Id.* at p. 85, PageID.1871.)

After Mr. Mathis left the healthcare center, RN McInnis continued to treat patients, answer the phone, and, because it was nearing the end of her shift, she gave a verbal report to the day-shift workers starting their shift. (*Id*. at p. 44, PageID.1830.) RN McInnis had written Mr. Mathis's vital signs on a piece of payer and placed the paper in her work mailbox, but because "[i]t started to become very hectic" in healthcare, she did not chart her encounter with Mr. Mathis at that time. (*Id.* at pp. 43-45, PageID.1829-31 (stating "when I left that day, I completely forgot to write a nurses' note on [Mr. Mathis] [] [p]robably because it was end of shift and there was [sic] 15 million things going on[.]").) However, RN McInnis verbally reported to the oncoming dayshift workers, and specifically nurses Mineka Thompson and Defendant Erin Byrne, "what happened" with Mr. Mathis – that "he

---

[2] RN McInnis explained that Mr. Mathis generally used a cane when walking, but that he had a "wheelchair detail for long distances." (ECF No. 89-4, RN McInnis Dep. at pp. 39-40, 86, PageID.1825-26.)

had a fall out in the lobby" – and she requested that they "Please keep an eye on Mr. Mathis." (*Id.* at p. 45, PageID.1831.)

RN McInnis charted her treatment of Mr. Mathis when she returned to work the following Monday morning. (*Id.* at p. 46, PageID.1832) (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.714.)

### 4.  Mr. Mathis returns to the MRF healthcare center and is examined by Defendants RN Byrne and PA Farris

At around 10:30 a.m. on Friday, June 22, 2018, approximately four hours after Mr. Mathis left the MRF healthcare center after being examined by RN McInnis, Mr. Mathis's cell mate notified Corrections Officer Tony Bohannon that Mr. Mathis was not feeling well. (ECF No. 70-14, Excerpt from Critical Incident Report MRF-096-18, PageID.1022.) Mr. Mathis told Officer Bohannon that his head was hurting really bad. (*Id.*) Officer Bohannon notified healthcare, and two nurses came to the unit and escorted Mr. Mathis to the MRF healthcare center for treatment. (*Id.*)

Defendant RN Byrne assessed Mr. Mathis in the MRF healthcare center at approximately 11:18 a.m. on Friday, June 22, 2018. (ECF No. 89-7, RN Byrne Nurse Protocol Note, PageID.2109-10.) At that time, Mr. Mathis reported to RN Byrne that he tripped, lost his balance, and fell in his housing unit, hitting the parietal area of his head on a door. (*Id.*) He denied losing consciousness and complained of a

9

headache and left hip pain. (*Id.*) (ECF No. 89-5, RN Byrne Dep. at p. 37, PageID.1913.) RN Byrne then performed a "head-to-toe assessment" of Mr. Mathis. She found that his skin temperature was normal and dry, he had no external signs of injury, including on his head, and he had left hip pain. (ECF No. 89-7, RN Byrne Nurse Protocol Note, PageID.2109-10.) She noted that Mr. Mathis was awake, aware, and oriented "x4," and his pupils were equal and reactive to light. (*Id.*) And Mr. Mathis's vital signs were all normal. (*Id.*)

RN Byrne did note that Mr. Mathis was "slow to respond to questions." (*Id.*) However, because of her limited interactions with Mr. Mathis in the past, RN Byrne did not know if Mr. Mathis's slow speech was his baseline or the result of any injury. (ECF No. 89-5, RN Byrne Dep. at p. 55, PageID.1931.) RN Byrne testified that she did not see any signs or symptoms of a concussion or brain bleed in Mr. Mathis. (*Id.* at p. 115, PageID.1991.) She then referred Mr. Mathis to Defendant Kim Farris, a Physician Assistant (PA), for further assessment. (*Id.* at p. 39, PageID.1915) (ECF No. 89-7, RN Byrne Nurse Protocol Note, PageID.2109-10.)

Defendant PA Farris then assessed Mr. Mathis "for a headache due to a fall." (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.) PA Farris noted RN Byrne's normal assessment findings and that Mr. Mathis "reported he was walking in his unit and stumbled and fell." (*Id.*) PA Farris completed a "mini-mental

10

status evaluation" and physical examination of Mr. Mathis and found that Mr. Mathis was alert and oriented "x3," and his head, face, hands, elbows, and knees did not show any sign of trauma, hematomas, contusions, or abrasions. (*Id.*) Mr. Mathis was able to successfully follow PA Farris's commands "related to testing his coordination, strength, moving his head, [and] extremities," and he denied any chest pain, shortness of breath, dizziness, visual changes, nausea, or vomiting, but did say he had a slight headache. (*Id.*) PA Farris found that Mr. Mathis was stable and appeared to be okay and that he did not show any signs or symptoms of a head injury. (ECF No. 89-6, PA Farris Dep. at pp. 42, 79, PageID.2041, 2078.) PA Farris was aware that Mr. Mathis was on Coumadin, but she did not note any signs or symptoms during her assessment of Mr. Mathis that might be associated with complications from the use of such medication and a fall, such as a brain bleed. (*Id.* at pp. 45-46, 89, PageID.2044-45, 2088 (explaining that the sign or symptoms she would look for were "if the pupils are blown, any bleeding or fluid coming out of the ears, asymmetry in the face sort of like a stroke presentation, aphasia, cannot follow orders," and deviations from baseline).)

PA Farris instructed RN Byrne to let Mr. Mathis stay in the emergency room for a while longer and then reassess him in approximately one hour. (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.)

Mr. Mathis was in observation for approximately 30-35 minutes when he stated he felt better and wanted to return to his housing unit. (ECF No. 89-6, PA Farris Dep. at p. 100, PageID.2099.) After her assessment, RN Byrne informed PA Farris that Mr. Mathis said he was feeling better and that he wanted to leave and return to his housing unit. (*Id.* at p. 45, PageID.2044) (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.) PA Farris instructed RN Byrne to make sure Mr. Mathis was called back "at the next medication pass to do a follow up for his vital signs and neuro assessment." (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.) RN Byrne charted that Mr. Mathis was to be "called out later today for recheck on vitals." (ECF No. 89-7, RN Byrne Nurse Protocol Note, PageID.2109-10.)

PA Farris testified that she did not initially document her encounter with Mr. Mathis based on her habit and practice not to document encounters or assessments conducted in conjunction with a nurse, whom she would rely on to document the care provided. (ECF No. 89-6, PA Farris Dep. at p. 34, PageID.2033.)

### 5.   Mr. Mathis is found unresponsive in his cell

At around 6:00 p.m. on June 22, 2018, fellow prisoner Larry Simpkins found Mr. Mathis unconscious in his cell. (ECF No. 76-12, Deposition of Larry Simpkins

at pp. 18-19, PageID.1529.) Mr. Simpkins attempted to wake Mr. Mathis, but when he would not wake, Mr. Simpkins called for corrections officers for help. (*Id.*)

Upon the officers' arrival, they found no pulse and no spontaneous breathing by Mr. Mathis, and they called healthcare for assistance. (ECF No. 70-9, Excerpt from Pl.'s Med. Record, PageID.706.) Nurses Byrne and Menika E. Thompson responded. The corrections officers attempted cardiopulmonary resuscitation (CPR) on Mr. Mathis, and a nurse administered two doses of Narcan to Mr. Mathis and used an automated external defibrillator (AED) on him. (*Id.*) Mr. Mathis regained a pulse and once an ambulance crew arrived, they placed an IV line, intubated Mr. Mathis, and then transported him to the hospital in critical condition. (*Id.*) Mr. Mathis was later pronounced dead at the hospital.

The Macomb County Medical Examiner stated that Mr. Mathis's cause of death was anoxic encephalopathy and related complications due to acute subdural hematoma. (ECF No. 89-9, Autopsy Report, PageID.2115.)[3] The medical examiner

---

[3] "Anoxic encephalopathy, or hypoxic-ischemic brain injury, is a process that begins with the cessation of cerebral blood flow to brain tissue, which most commonly results from poisoning (for example, carbon monoxide or drug overdose), vascular injury or insult, or cardiac arrest." *See* https://pubmed.ncbi.nlm.nih.gov/30969655/#:~:text=Anoxic%20encephalopathy%2C%20or%20hypoxic%2Dischemic,or%20insult%2C%20or%20cardiac%20arrest [**https://perma.cc/5T3A-MMMN**]. A "subdural hematoma" is a type of bleed which occurs within the skull but outside the actual brain that is usually caused by a

found no external signs of injury on Mr. Mathis's body, except for injuries related to attempted resuscitation. (*Id.* PageID.2116-19.) He further found that there was also no trauma to Mr. Mathis's scalp or to his brain's dura matter, but the "left cerebral hemisphere is covered by clotted acute subdural hemorrhage." (*Id.*)

### B.    Procedural History

On March 31, 2021, Plaintiff Shatia S. Mathis, as Personal Representative of the Estate of William Mathis, brought this action against the following defendants: (1) RN Cynthia McInnis; (2) RN Erin Byrne; (3) PA Kim Farris; (4) Corizon Health Inc.; (5) Quality Correctional Care of Michigan, P.C.; and (6) John Doe Medical Providers. (ECF No. 1, Complaint) Plaintiff asserts an Eighth Amendment deliberate indifference claim against Defendants and a *Monell* claim against the Corizon defendants.

On August 18, 2021, Plaintiff filed her First Amended Complaint against the same Defendants and asserting the same claims. (ECF No. 33, FAC.)

On December 26, 2023, this Court granted Defendant Cynthis McInnis, RN's Motion for Summary Judgment and dismissed Plaintiff's Eighth Amendment

---

head injury. https://my.clevelandclinic.org/health/diseases/21183-subdural-hematoma **[https://perma.cc/62UX-TF3V].**

deliberate indifference claim against her with prejudice. (ECF No. 86, Opinion and Order.)

On February 13, 2024, Defendant RN Byrne filed a Motion for Summary Judgment seeking dismissal of Plaintiff's Eighth Amendment deliberate indifference claim against her. (ECF No. 92.)[4] Plaintiff filed a Response in opposition to RN Byrne's Motion (ECF No. 94), and RN Byrne filed a Reply brief. (ECF No. 96.)

On February 16, 2024, Defendant PA Farris filed a Motion for Summary Judgment seeking dismissal of Plaintiff's Eighth Amendment deliberate indifference claim against her. (ECF No. 93.) Plaintiff filed a Response in opposition to PA Farris's Motion (ECF No. 95), and PA Farris filed a Reply brief. (ECF No. 97.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[4] On February 5, 2024, this Court entered an Order Granting Defendants Erin Byrne, RN's, and PA Kim Farris's unopposed Joint Motion for Leave to File Motion for Summary Judgment. (ECF No. 91.) The Court found that the Defendants had demonstrated excusable neglect for filing late motions for summary judgment "because of the delays and uncertainties attributable to the Corizon bankruptcy, the withdrawal of counsel for Defendant Farris, and the multiple extensions of the scheduling orders in this case," and further found that "Plaintiff has failed to demonstrate that she will be materially prejudiced as discovery has closed and a trial date has not yet been set." (*Id.*)

and the movant is entitled to judgment as a matter of law." "A fact is material if its resolution will affect the outcome of the lawsuit." *F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198, 203 (6th Cir. 2021). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, no genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, if the nonmoving party will bear the burden of proof on a claim, the movant "need only demonstrate that the nonmoving party has failed to 'make a showing sufficient to establish the existence of an essential element' of that claim." *Id.* (quoting *Celotex*, 477 U.S. at 322). Thereafter, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[T]he non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more

16

than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558-59 (6th Cir. 2009). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[The] general rule [is] that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (quotation marks omitted)).

## III.  ANALYSIS

Plaintiff claims that Defendants RN Byrne and PA Farris were deliberately indifferent to Mr. Mathis's serious medical needs and that their failure to adequately care for Mr. Mathis resulted in his death.

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

17

An Eighth Amendment deliberate indifference claim has two components, one objective – a "'sufficiently serious' medical need" – and the other subjective – a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). "The plaintiff must show both that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable enough state of mind, rising above gross negligence." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).

Specifically, the objective component asks whether the prisoner faced a risk of sufficiently serious harm. *Farmer*, 511 U.S. at 834 (noting that "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'"); *see also Blackmore*, 390 F.3d at 895. To prove this objectively serious harm, a prisoner must first establish that he or she has "serious medical needs," *Estelle*, 429 U.S. at 106, and, if the prisoner has received some care for that serious medical need and he seeks redress based on the inadequacy of that care, he must show that such care was "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable as to fundamental fairness." *Rhinehart*, 894 F.3d at 737 (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). "This will often require 'expert medical testimony ... showing the medical necessity for' the desired treatment and

18

'the inadequacy of the treatments' the inmate received." *Rhinehart*, 894 F.3d at 737-38 (citations omitted).

Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 702. "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838. In other words, "mere malpractice does not violate the Eighth Amendment." *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021) (citing *Estelle*, 429 U.S. at 106); *Rhinehart*, 894 F.3d at 738 ("A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.").

In addition, because § 1983 does not permit a plaintiff to impose vicarious liability on one defendant for another defendant's actions, a plaintiff must independently establish these objective and subjective elements for each medical provider he sues. *Phillips*, 14 F.4th at 536 ("[T]he subjective component of a deliberate indifference claim must be addressed for each officer individually.") (citation omitted). The Court must consider the individual defendants' conduct "'based on the information that was available to them at the time[,]'" and

19

"'information available to one defendant may not be automatically imputed to the other[ ]'" defendants. *Burwell v. City of Lansing*, 7 F.4th 456, 466 (6th Cir. 2021) (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 443-447 (6th Cir. 2014)); *see also Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 312 (6th Cir. 2023) ("[W]e review each defendant's actions individually."). Ultimately, the evidence must demonstrate that the individual defendant was personally "aware of facts from which he or she could infer a substantial risk of serious harm," and the evidence must also demonstrate that the individual defendant did, in fact, draw that inference and then consciously disregarded the risk of harm. *Winkler v. Madison Cnty., Ky.*, 893 F.3d 877, 891, 891 (6th Cir. 2018).

## A. The Objective Component

### 1. Whether Mr. Mathis suffered from an objectively serious medical need at the time RN Byrne and PA Farris treated him

To prove objectively serious harm in the health context, prisoners must first establish that they have objectively "serious medical needs." *Phillips*, 14 F.4th at 534 (citing *Estelle*, 429 U.S. at 106). "They can do so, for example, by showing that a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care." *Id.* (citing *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013)); *see also, e.g., Griffith v.*

*Franklin Cnty., Ky.*, 975 F.3d 554, 567 (6th Cir. 2020) (finding the plaintiff who suffered two seizures at the jail and a third after being transferred to the hospital suffered from a sufficiently serious medical condition). "A serious medical need alone can satisfy this objective element if doctors effectively provide no care for it." *Id.* (citing *Rhinehart*, 894 F.3d at 737).

Defendants RN Byrne and PA Farris argue that Mr. Mathis had no signs of any objectively serious medical need at the time they treated him on June 22, 2018. *See Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (explaining that the court assesses the medical need that the plaintiff experienced *at the time the defendant took the challenged actions*). PA Farris and RN Byrne assert that the record evidence shows that Mr. Mathis presented to them with suffering a headache following a fall. However, he exhibited no signs of head trauma or a traumatic brain injury or other outward signs of injury or neurological impairment when they each examined him, and his vital signs remained stable, with no dizziness, nausea, vomiting, or lightheadness. (ECF No. 89-5, RN Byrne Dep. at pp. 50-51, PageID.1926-27) (ECF No. 89-7, RN Byrne Nurse Protocol Note, PageID.2109-10) (ECF No. 89-6, PA Farris Dep. at pp. 36-37, PageID.2035-36) (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.) Mr. Mathis reported that his headache improved over time after he was given his scheduled medications of Norco and Ultram. (ECF

No. 89-7, RN Byrne Nurse Protocol Note, PageID.2101-10.) And while RN Byrne noted that Mr. Mathis was "slow to respond" to questions upon her examination, she testified that she did not know if this was his normal speech pattern. (ECF No. 89-5, RN Byrne Dep. at p. 55, PageID.1931.) PA Farris, who had more experience treating Mr. Mathis, did not note the same slow speech pattern upon her examination. The results of RN Byrne's and PA Farris's examinations of Mr. Mathis were very similar to those of RN McInnis's assessment of him earlier that morning.

Both Plaintiff's RN expert Valerie Tennessen and Defendants' RN expert Kathryn J. Wild agree that the healthcare providers did not have "any cause for concern" based on the findings in their examinations of Mr. Mathis on June 22, 2018, and no reason to believe that Mr. Mathis had a serious medical problem at the time they were treating him. (ECF No. 89-2, Pl. RN Expert Tennessen Dep. at pp. 56-57, 99, PageID.1738-39, 1781) (ECF No. 89-14, Def. RN Expert Kathryn J. Wild, RN, Expert Report, at pp. 6-9, PageID.2315-18 (opining that "Mr. Mathis was appropriately seen by three healthcare professionals on the day of his fall without evidence of head trauma or concussion. The assessments were well within the standard of care.").) Plaintiff's RN Expert agreed that RN Byrne did an appropriate head-to-toe assessment of Mr. Mathis. (ECF No. 89-2, Pl. RN Expert Tennessen Dep. at p. 83, PageID.1765.) Defendants' PA Expert Raymond Mooney, PA-C,

similarly agreed that PA Farris performed an appropriately focused physical assessment of Mr. Mathis that was negative for any signs of a serious medical need. (ECF No. 89-10, Def. PA Expert Report of Raymond A. Mooney, PA-C, PageID.2135-36.)

Plaintiff contends in response that Mr. Mathis had a long list of known serious medical conditions, that RN Byrne and PA Farris knew Mr. Mathis stated that he fell and hit his head and had a headache, and that RN Byrne noted that he was slow to respond to questions and designated Mr. Mathis's presentation as "EMERGENT/URGENT." Plaintiff asserts that "[a]nyone observing [Mr. Mathis] would realize he was at high risk of serious injury of death from the fall." (ECF No. 94, Pl. Resp., PageID.2398-2400.) Plaintiff also contends that her PA expert, James Van Rhee, PA, testified that trauma to the head requires an immediate CT scan to accurately diagnose a head injury and rule out a potential brain bleed. (*Id.* PageID.2399.) Plaintiff argues that this evidence satisfies the objective prong of the deliberate indifference analysis.

The Court finds that Plaintiff has not demonstrated that it would be obvious that Mr. Mathis needed to be treated for a concussion or brain bleed based on his symptoms when assessed by RN Byrne and PA Farris on June 22, 2018, or that Mr. Mathis's medical conditions and medications, coupled with a fall, are enough to

23

establish that he suffered from an objectively serious medical condition at the time he was assessed by those Defendants. It is undisputed that RN Byrne evaluated Mr. Mathis on June 22, 2018, and that she found no signs or symptoms of any significant injury or other serious medical condition. She noted he complained of a headache, and she noted that he was slow to respond to questions, although she testified that she did not know if this speech was slow or if it was his baseline. Mr. Mathis was provided his scheduled medications, Ultram and Norco, which he reported decreased his headache. RN Byrne promptly referred Mr. Mathis to a medical provider, PA Farris, for further assessment.

PA Farris similarly found upon examination that Mr. Mathis was free of external signs of trauma, his neurological symptoms were normal, he was alert and oriented, and he appropriately responded to commands. PA Farris was familiar with Mr. Mathis, having interacted with him previously in the Coumadin clinic and providing chronic disease care, and she did not note any slow speech or any other concern. (ECF No. 89-8, Farris Critical Incident Report, PageID.2112.) Thus, neither RN Byrne nor PA Farris diagnosed Mr. Mathis with an objectively serious medical condition.

In addition, both Plaintiff's and Defendants' nurse medical experts opined that RN Byrne had no reason to believe that Mr. Mathis had a serious medical problem

at the time she provided treatment to him. Specifically, Plaintiff's expert, Valerie Tennessen, R.N., agreed that, when RN Byrne examined Mr. Mathis on June 22, 2018, Mr. Mathis's vital signs were all within normal limits, and there was nothing that would "indicate any cause for concern." (ECF No. 89-2, Pl. RN Expert Tennessen Dep. at pp. 56-57, PageID.1738-39.) Similarly, Defendants' nurse expert, Kathryn Wild, R.N., opined that when RN Byrne assessed Mr. Mathis, his vital signs were within the normal range, his neuro exam was within normal limits, and there was no notable injury to Mr. Mathis's head. RN Wild noted that the only unusual finding was that Mr. Mathis complained of a headache and he was "slow to respond" to questions. RN Byrne thus asked PA Farris to assess Mr. Mathis for any further treatment recommendations. (ECF No. 89-14, RN Wild Expert Report, PageID.2317.) RN Wild opines that "MDOC nursing personnel provided appropriate care and treatment to Mr. Mathis, based on his presentation and the information he provided." (*Id.* PageID.2318.)

Similarly, Defendants' PA expert, Raymond A. Mooney, PA-C, opined that PA Farris "performed an appropriate focused physical assessment of Mr. Mathis," including a sufficient neurological assessment, but did not find any signs of trauma one would expect with a head injury. (ECF No. 89-10, Def. PA Expert Mooney Report, PageID.2134-35.) And Plaintiff's PA expert, James Van Rhee, PA-C,

acknowledged that PA Farris's initial evaluation of Mr. Mathis was adequate, that she noted no abnormal vital signs upon her examination of Mr. Mathis, and that she found no symptoms consistent with a brain bleed. (ECF Nos. 89-12 and 89-13, Deposition of Pl. PA Expert James Van Rhee, PA-C, at pp. 62, 70-71, 84, PageID.2208, 2218-19, 2232.) Accordingly, these expert opinions further support the finding that there is no evidence that Mr. Mathis suffered an objectively serious medical condition such as a brain bleed or concussion at the time RN Byrne and PA Farris treated him on June 22, 2018, that any layperson would agree necessitates care. *See Phillips*, 14 F.4th at 534.

Court addressing similar facts have found that the plaintiffs' deliberate indifference claims failed to demonstrate an objectively serious medical need. *See Wagle v. Corizon*, No. 19-13787, 2023 WL 2749147, at *6-7 (E.D. Mich. Mar. 31, 2023) (finding that although the plaintiff suffered visible injuries sustained in a fight with another prisoner, including a purple and swollen left eye, bumps and scratches, a sore face, hurt nose, and a headache, for which he received treatment, that evidence does not demonstrate that it was obvious the plaintiff needed treatment for a concussion) (citing *Jones v. Wardlow*, No. 3:08–cv–545–TLS, 2013 WL 6629334, at *2 (N.D. Ind. Dec. 17, 2013) (finding a reasonable jury could not conclude that plaintiff, who was injured after he was attacked by other prisoners, suffered from an

objectively serious medical condition when he did not "presen[t] any evidence that he was actually displaying signs and symptoms of a concussion or internal injuries" and, instead, displayed swelling, a cut on his face, and small lacerations on his head—which were "not so obviously serious that even a lay person would easily recognize the need for medical attention"); *Estate of Clutters v. Sexton*, No. 1:05cv223, 2007 WL 3244437, at *13 (S.D. Ohio Nov. 2, 2007) (finding that there was nothing obvious about the plaintiff's condition that would have indicated that his head injury needed medical treatment when prison officials testified that the plaintiff was alert after falling and hitting his head and when a paramedic testified that the cut on the back of his head stopped bleeding, the cut did not need stiches, and the plaintiff was alert during his examination)).

The Court rejects Plaintiff's cursory argument in her Response briefs that she has satisfied the objective prong of the deliberate indifference analysis because Mr. Mathis died from his injuries, citing to *Burwell v. City of Lansing*, 7 F.4th 456 (6th Cir. 2021). Plaintiff asserts that the Sixth Circuit Court of Appeals in *Burwell* stated that is has "routinely held that a condition resulting in death is 'sufficiently serious' to meet the objective component." *Burwell*, 7 F.4th at 463-64. However, as this Court explained in its prior Opinion and Order, *Burwell* is inapposite to this case. In *Burwell*, the court did not find the existence of a serious medical condition based on

the sole fact that the prisoner died. Rather, the Sixth Circuit found that the prisoner exhibited clear and undeniable signs of medical distress associated with overdosing before he died that would be obvious to a lay person that the prisoner had a serious medical need, including being "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly," with a pool of vomit forming around his head. *Id.* at 464. There is no evidence in this case that, at the time RN Byrne and PA Farris treated Mr. Mathis, he exhibited similarly serious signs or symptoms associated with a head injury or other clear and undeniable signs of medical distress.

Rather, this case is more like *Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009), which is distinguished in *Burwell*, where the court found that the plaintiff failed to establish a sufficiently serious medical need when the detainee, who subsequently died, was examined. Specifically, medical personnel examined the overdosing detainee and determined that he exhibited no signs of visible distress from crack cocaine use, other than hallucinations. *Id.* at 254-55. The court found that, based on the lack of outward signs of distress and the conclusions of medical personnel who determined that the detainee did not need to go to the hospital, that the plaintiff failed to establish an objectively serious medical need because such need "was not obvious to trained medical personnel." *Id.* at 255; *cf. Winkler*, 893 F.3d at 892-93 (holding

28

nurse was not deliberately indifferent when she misdiagnosed a severe ulcer – which was lethal – as symptoms of opiate withdrawal, and treated that diagnosis); *Rouster*, 749 F.3d at 448-51 (holding nursing staff not deliberately indifferent when they misdiagnosed detainee's ulcers as potential alcohol withdrawal and attempted, unsuccessfully, to treat that condition, and the detainee ultimately died).

Accordingly, for all these reasons, the Court finds that Plaintiff has failed to demonstrate that Mr. Mathis suffered an objectively serious medical need at the time RN Byrne and PA Farris examined him on June 22, 2018.

However, even if the Court did find that Mr. Mathis suffered an objectively serious medical need at that time, because Mr. Mathis was provided some care, Plaintiff "must show more" to establish the objective prong. *Phillips*, 14 F.4th at 535. Specifically, as discussed next, Plaintiff would need to offer medical evidence that the care RN Byrne and PA Farris provided was "grossly incompetent" or grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness" to satisfy the objective component of Plaintiff's Eighth Amendment deliberate indifference claim. *See Rhinehart*, 894 F.3d at 737 (citation omitted).

> **2.  Whether the care RN Byrne and PA Farris provided to Mr. Mathis on June 22, 2018 was "grossly incompetent" or grossly "inadequate"**

As discussed above, the undisputed evidence shows that Mr. Mathis received care from RN Byrne and PA Farris on June 22, 2018. Indeed, Plaintiff states in her Response briefs that "Plaintiff does not allege Byrne [and Farris] failed to treat [Mr. Mathis] but rather [that] Byrne's [and Farris's] care was so grossly incompetent or inadequate as to shock the conscience of a reasonable person." (ECF No. 94, Pl. Resp., PageID.2400-01) (ECF No. 95, Pl. Resp., PageID.2431.) Plaintiff thus contends that Mr. Mathis received inadequate treatment from RN Byrne and PA Farris, not that he received no treatment at all from either Defendant.

Therefore, even if Plaintiff could establish that Mr. Mathis suffered an objectively serious medical need for treatment at the time RN Byrne and PA Farris examined him, Plaintiff cannot rely on Mr. Mathis's alleged serious medical need alone to establish the objective element of his deliberate indifference claim against these Defendants. *See Phillips*, 14 F.4th at 536. Instead, Plaintiff must show that the care RN Byrne and PA Farris did provide was "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness." *See Rhinehart*, 894 F.3d at 737 (citation omitted). This generally requires expert medical testimony "showing the medical necessity for the desired treatment

30

and the inadequacy of the treatments the [plaintiff] received." *Id.* at 737-38; *see also Phillips*, 14 F.4th at 535 ("Phillips needed to present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so.").

RN Byrne argues that the expert medical evidence in this case shows that she acted appropriately in her treatment of Mr. Mathis. Plaintiff's RN Expert Tennessen testified that RN Byrne provided "good" care in assessing Mr. Mathis on June 22, 2018, aside from her complaint that RN Byrne failed to document properly all of her interactions with Mr. Mathis that day such as her reassessment of Mr. Mathis before he returned to his housing unit. (ECF No. 89-2, Pl. RN Expert Tennessen Dep. at pp. 84-86, PageID.1766-68.) Tennessen thus opined that RN Byrne performed an appropriate assessment and provided appropriate care to Mr. Mathis on June 22nd, not that she provided "grossly incompetent" or "inappropriate" care. (*Id.*) And while Tennessen criticizes RN Byrne for failing to document all of her interactions with Mr. Mathis that day and for failing to continue to monitor him even after he said he wanted to leave, Tennessen did not testify that RN Byrne's failure to do so constituted "grossly incompetent" or grossly "inadequate" treatment of Mr. Mathis. (*Id.* at pp. 85-86, 99, PageID.1767-68, 1781 (agreeing that she does not opine that the medical providers in this case failed to provide care or that they were deliberately

indifferent to Mr. Mathis's medical needs).) *See Phillips*, 14 F.4th at 538-39 (stating that the plaintiff "needed to 'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment'") (quoting *Santiago*, 734 F.3d at 590).

In response, Plaintiff asserts that her PA Expert, James Van Rhee, testified that it is obvious that a person who suffers a fall impacting his head, coupled with the use of Coumadin, constitutes a serious medical condition, requiring an immediate CT scan. However, the Court finds that Plaintiff's reliance on her PA expert, James Van Rhee, with regard to RN Byrne's treatment of Mr. Mathis is wholly misplaced as he admits that his opinion is not relevant regarding RN Byrne's care of Mr. Mathis. PA Van Rhee testified that he did not make "any comments, or have any opinions about what the RNs did in this case related … to … the standard of care or anything that a nurse should have done now in this situation." (ECF Nos. 89-12 and 89-13, Pl. PA Expert Van Rhee Dep., at pp. 13, 48, 104, PageID.2159 (admitting he has no training as a nurse), 2194, 2252.)[5] Further RN Tennessen

---

[5] Moreover, PA Van Rhee's expertise in this case is questionable, as he testified that he lacks expertise regarding correctional medical standards, acknowledging "I don't know about prisons" and "I've not worked in the prison system … [and] don't know the rules and regulations for a prison system," and that he has no correctional medical experience. (*Id.* at pp. 76, 105, PageID.2224, 2253.)

admitted that a nurse cannot, on her own order a CT scan for a patient. (ECF No. 89-2, Pl. RN Expert Tennessen Dep. at p. 86, PageID.1768.)

As for Defendant PA Farris, as discussed above, PA Van Rhee acknowledged that the PA Farris's initial evaluation of Mr. Mathis was adequate, that she noted no abnormal vital signs upon her examination of Mr. Mathis, and that she found no symptoms consistent with a brain bleed. (ECF Nos. 89-12 and 89-13, Pl. PA Expert Van Rhee Dep., at pp. 62, 70-71, 84, PageID.2208, 2218-19, 2232.) Van Rhee instead disagrees with PA Farris's medical decision-making discretion in this case, critiquing her failure to monitor Mr. Mathis for a longer period of time or order a CT scan for him. He did not opine that PA Farris's care of Mr. Mathis was "so grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be intolerable to fundamental fairness." (*Id.* at p. 84, PageID.2232.) *See Rhinehart*, 894 F.3d at 737 (citation omitted). Van Rhee's disagreement with PA Farris's professional decision-making sounds in medical malpractice, not deliberate indifference. *See Estelle*, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ...."); *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) ("There is no … claim just because an

33

inmate believes that medical personnel should have attempted different diagnostic measures or alternative methods of treatment.").

Plaintiff also asserts her experts are critical of Defendants' failure to continue to monitor Mr. Mathis. However, the evidence shows that PA Farris did instruct RN Byrne to keep Mr. Mathis in the medical center for an hour for observation and then do a re-check to determine next steps. (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.) However, after about 30-35 minutes, Mr. Mathis stated that he felt better and wanted to leave. MDOC policy states that outside of involuntary mental health treatment, a medical provider may not provide medical care to a prisoner if that prisoner does not provide consent. (ECF No. 89-11, MDOC PD 03.04.105 – Informed Consent to Medical Care, PageID.2412-45.) Thus, neither RN Byrne nor PA Farris could have forced Mr. Mathis to stay in the medical center any longer for observation without his consent. PA Farris instead ordered that Mr. Mathis be reassessed at his next medication check later that day. (ECF No. 89-8, PA Farris Critical Incident Report, PageID.2112.)

The Court finds, viewing all the evidence in the light most favorable to Plaintiff, that no reasonable juror could find that Plaintiff has shown that RN Byrne's and PA Farris's treatment of Mr. Mathis on June 22, 2018 was so "grossly incompetent" or so grossly "inadequate" as to "shock the conscience" or "be

intolerable to fundamental fairness." *See Rhinehart*, 894 F.3d at 737. Rather, Plaintiff's allegations at most sound in medical negligence. Accordingly, Plaintiff has failed to meet the objective prong of his Eighth Amendment deliberate indifference claim against Defendants RN Byrne and PA Farris, and those claims are dismissed with prejudice. *Phillips*, 14 F.4th at 535; *Wagle*, 2023 WL 2749147, at *8 & n.10 (collecting cases examining claims in which a plaintiff received some treatment for visible injuries and did not put forth evidence suggesting that he or she was harmed by a failure to diagnose or treat a concussion and finding that the plaintiff could not establish a deliberate indifference claim).

## B. Subjective Component

### 1. The subjective component standard

Even if the Court were to find that Plaintiff could satisfy the objective prong of the Eighth Amendment deliberate indifference claim against Defendants RN Byrne and PA Farris, Plaintiff must also meet the subjective prong of the deliberate indifference test. *See Phillips*, 14 F.4th at 535. "This part asks: Did the official know of and disregard the serious medical need?" *Id.* (citing *Farmer*, 511 U.S. at 834, 838-39). Evidence showing an accidental harm does not suffice; rather "[a]n official must cause the harm with a sufficiently culpable mental state – in this context, criminal recklessness." *Id.* (citations omitted). This is because "[t]he Eighth Amendment does

35

not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id.* at 837. "In this healthcare setting, a [RN or PA] must first know of the facts that show the serious medical need and must personally conclude that this need exists. The [RN and PA]'s response next must 'consciously disregard[]' the need." *Id.* (internal and end citations omitted); *see also Rhinehart*, 894 F.3d at 738 ("This showing requires proof that each defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, and that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it.") (quoting *Comstock*, 273 F.3d at 703).

"A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart*, 894 F.3d at 738 (quoting *Farmer*, 511 U.S. at 842). But "[a] [healthcare provider's] errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Id*. Accordingly, "[w]here the plaintiff has received some medical treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Burgess*, 735 F.3d at 477 (citation omitted); *Rhinehart*, 894 F.3d at 738 ("[W]hen a claimant challenges the adequacy of an inmate's treatment, 'this Court is deferential to the judgments of medical professionals.'") (citation omitted). However, "[a] plaintiff can nevertheless

36

satisfy this [subjective] standard by demonstrating that a medical professional 'consciously expos[ed] the patient to an excessive risk of serious harm' in administering treatment, or rendered medical care 'so woefully inadequate as to amount to no treatment at all." *Griffith*, 975 F.3d at 568 (internal and end citations omitted).

Defendants RN Byrne and PA Farris argue that Plaintiff cannot meet this burden. The Court agrees.

### 2. Whether RN Byrne and PA Farris knew of and consciously disregarded Mr. Mathis's serious medical needs

Defendants RN Byrne and PA Farris argue that there is no evidence that either Defendant knew of and consciously disregarded a serious medical need of Mr. Mathis on June 22, 2018. The Defendants assert that they each promptly physically examined Mr. Mathis and assessed his condition. When they examined Mr. Mathis, his vital signs were normal, there were no external signs of injury, and other than a complaint of a headache, which eased with medication, Mr. Mathis did not show any signs or symptoms of a traumatic brain injury or subdural hematoma. After their assessments, Mr. Mathis was kept in the emergency room for observation and reassessment in one hour. However, after approximately 30 to 35 minutes, Mr. Mathis reported to RN Byrne that he felt better and wanted to return to his housing

unit. RN Byrne and PA Farris had no authority under MDOC policy to make Mr. Mathis stay and accept further treatment, so he was released with an instruction to return later in the afternoon for re-evaluation. The Defendants argue that, even viewed in the light most favorable to Plaintiff, their actions cannot be construed as a failure to treat or deliberate indifference.

Plaintiff contends that there is an issue of material fact as to whether Defendants RN Byrne and PA Farris knew that Mr. Mathis was at a high risk of a brain bleed following his fall that required immediate medical attention and consciously disregarded that risk. Plaintiff argues that it was "reasonably inferable" that RN Byrne was aware of a serious medical need because she had treated Mr. Mathis in the past, she knew he had a long list of serious medical conditions, and she had access to the list of his medications, including Coumadin. RN Byrne also knew Mr. Mathis complained he had fallen and hit his head, he had a headache, and she noted that he was slow to respond to questions.

Plaintiff similarly contends that PA Farris knew Mr. Mathis's health was at a substantial risk because she had treated Mr. Mathis in the past, she knew about his health issues, and she knew Mr. Mathis was on Coumadin. PA Farris also knew Mr. Mathis frequently downplayed the severity of his conditions and she believed he was downplaying his injuries on the day in question. Plaintiff alleges that the Defendants'

conduct was grossly incompetent and reckless because PA Farris should have ordered Mr. Mathis's transfer to a hospital for a CT scan or followed Mr. Mathis out of the medical center when he stated he wanted to leave and persuaded him to return.

The Court agrees with Defendants RN Byrne and PA Farris that, viewing the evidence in the light most favorable to Plaintiff, there is no evidence that either Defendant knew or suspected that Mr. Mathis may be suffering from a brain bleed or other serious medical condition at the time they assessed him and yet consciously disregarded that risk. The undisputed evidence shows that both Defendants separately provided Mr. Mathis with prompt treatment and conducted assessments of him which revealed no adverse findings indicative of a traumatic head injury or brain bleed at that time. Mr. Mathis's vital and neurological signs were normal, he denied nausea or dizziness, and his reported headache improved with administration of his scheduled medications of Norco and Ultram. RN Byrne promptly referred Mr. Mathis to PA Farris for further assessment. When a nurse passes information about a patient's symptoms on to a medical provider, such as a PA, liability for deliberate indifference by the nurse will generally not attach. *See Winkler*, 893 F.3d at 894-95. This is because nurses, unlike doctors or PAs, are "not licensed to independently diagnose conditions, devise treatment plans, or prescribe medicine." *Hamilton v. Pike Cnty., Ky.*, No. 11-99-ART, 2013 WL 529936, at *12 (E.D. Ky. Feb. 11, 2013).

And, while RN Byrne noted during her assessment that Mr. Mathis appeared slow to respond to questions, she testified that she did not know if his speech was actually slow or if that was his baseline. She thus appropriately referred him to PA Farris for further assessment. PA Farris, who was more familiar with Mr. Mathis, did not make such a finding on her subsequent assessment of Mr. Mathis. Further, there were no signs of external injury on Mr. Mathis at that time or even at the later time of his autopsy. PA Farris instructed RN Byrne to keep Mr. Mathis in the emergency room for one hour and then reassess him, but Mr. Mathis chose to leave after about 30 to 35 minutes, stating that his pain had improved, and he wanted to go back to his housing unit. PA Farris and RN Byrne did not have the authority to restrain Mr. Mathis from leaving or to force him to involuntarily submit to medical care, and thus could not have forced Mr. Mathis to stay for the full one-hour observation period. PA Farris instead ordered that Mr. Mathis be reassessed at his next medication check later that day.

In addition, Plaintiff's RN Expert Tennessen opined that RN Byrne's assessment findings with regard to Mr. Mathis did not indicate any cause for concern. (ECF No. 89-2, Pl. Expert RN Tennessen Dep. at pp. 56-57, PageID.1738-39.) Defendant's RN Expert Wild similarly opined that at no time during RN Byrne's assessments was there any indication that Mr. Mathis had any notable injury to his

40

head or a concussion. (ECF No. 89-14, Def. RN Wild Expert Report, PageID.2317-18.) Plaintiff's PA expert, Van Rhee, conceded that there was nothing in PA Farris's examination findings consistent with a brain bleed. (ECF No. 89-13, Pl. PA Expert Van Rhee Dep. at p. 71, PageID.2219.) And Defendants' PA expert, Raymond A. Mooney, PA-C, similarly opined that PA Farris's examination of Mr. Mathis failed to indicate any signs of head trauma or other head injury. (ECF No. 89-10, Def. Expert PA-C Mooney Report, PageID.2135.) In addition, both Plaintiff's and Defendants' experts opined that the medical providers were not deliberately indifferent to Mr. Mathis's medical needs on June 22, 2018. (ECF No. 89-2, Pl. Expert RN Tennessen Dep. at p. 99, PageID.1781) (ECF No. 89-14, Def. RN Expert Wild Expert Report, PageID.2318) (ECF No. 89-10, Def. PA Expert Mooney Report, pageID.2136.)

The Court finds, viewing the evidence in the light most favorable to Plaintiff, that there is no genuine issue of material fact as to whether that either RN Byrne or PA Farris consciously disregarded Mr. Mathis's medical needs or recklessly failed to take more aggressive steps in monitoring him, such as by ordering a longer observation period or pursuing a CT scan at a hospital. Even if the treatment of Mr. Mathis could be characterized as poor, the Eighth Amendment does not require

medical care "to be perfect, the best obtainable, or even very good." *Hoffer v. Sec'y Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (citation omitted).

As discussed *supra*, both RN Byrne and PA Farris testified that they each performed their own examinations of Mr. Mathis and the signs and symptoms they witnessed did not support a more aggressive course of action or indicate that they knew or suspected Mr. Mathis may be suffering from symptoms indicative of a brain bleed or other serious medical condition and yet failed to act. Even if there was a fact issue as to whether RN Byrne or PA Farris could be found to be negligent in failing to take more aggressive steps with regard to Mr. Mathis on June 22, 2018, that would only constitute a claim of medical malpractice that lies beyond the Constitution's reach, because "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Winkler*, 893 F.3d at 892-93 (citation omitted) ("Although [the defendant's] assessment and treatment of [the prisoner] might not represent the best of medical practices, her actions do not suggest deliberate indifference to a known risk to [the prisoner's] health."); *Sumlin v. Lampley-Copeland*, 757 F. App'x 862, 867 (11th Cir. 2018) (per curiam) (noting that the doctor's failure to detect the signs of a stroke "amounts, at most, to

42

negligence or medical malpractice, not deliberate indifference."). "[C]ourts are generally reluctant to second guess the medical judgment of prison medical officials." *Rouster*, 749 F.3d at 448. "[A]llegations that more should have been done by way of diagnosis and treatment and suggest[ions] of other options that were not pursued raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim." *Rhinehart*, 894 F.3d at 741 (punctuation modified); *see also Griffith*, 975 F.3d at 574 ("The decision to elevate [plaintiff's] results via the weekly [call] list rather than call an [advanced practice registered nurse] directly may be evidence that [defendant nurse] underestimated the severity of [plaintiff's] condition, but it does not demonstrate that she 'recklessly failed to act with reasonable care to mitigate [the] risk,' or that she should have known that his medical condition was declining.") (internal and end citations omitted); *Winkler*, 893 F.3d at 893 (finding that defendant physician did not have a reason to suspect that the plaintiff was suffering from a different, more harmful condition, and thus defendant's decision not to investigate further into what was causing plaintiff's symptoms might have been negligent but did not show that the defendant consciously exposed plaintiff to a risk of serious harm); *Wagle*, 2023 WL 2749147, at \*10 ("Wagle's allegations that Sattler should have provided different or additional

treatment by referring him to a physician or placing him under observation are insufficient to demonstrate that she acted with deliberate indifference.").

"With the benefit of hindsight, it is easy to say that [RN Byrne and/or PA Farris] should have encouraged … [a] call for immediate medical assistance. But [those Defendants] 'performed [their] duties. That [they] did not take the extra step of bringing the need for more aggressive intervention …, that failure at most ... amounts only to negligence,'" and "evidence of '[m]ere negligence is insufficient' to survive summary judgment on a deliberate indifference claim." *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 614 (6th Cir. 2022) (quoting *Smith v. Cnty. of Lenawee*, 505 F. App'x 526, 536 (6th Cir. 2012)); *see also Briggs v. Oakland Cnty., Mich.*, 213 F. App'x 378, 385 (6th Cir. 2007) (concluding that the record did not show deliberate indifference where the nurse "perceived a lesser risk of serious harm to [the inmate's] health" than what he was actually suffering from and acted according to that belief.).

As for Plaintiff's complaint that RN Byrne or PA Farris were deliberately indifferent because they did not properly document all of their assessments or interactions with Mr. Mathis on June 22, 2018, as explained in the Court's prior Opinion and Order, courts have generally found that "Eighth Amendment violations stemming from inadequate, incomplete, or inaccurate, or mislaid medical documents

44

are typically reserved for claims alleging systemic inadequacies in a jail's or prison's systems of medical record keeping," and not a failure to document an examination on one instance. *See Davis v. Caruso*, No. 07-cv-11740, 2009 WL 878193, at \*2 (E.D. Mich. Mar. 30, 2009) (collecting cases and finding no deliberate indifference where plaintiff alleged an omitted record from a procedure led to an unnecessary biopsy and the postponement of cancer treatment but failed to establish how the failure gave rise to a grave risk of unnecessary pain and suffering); *see also Anderson v. Hall*, No. 5:19-cv-6, 2020 WL 2896682, at \*3 (S.D. Ga. May 29, 2020) (finding that the medical provider's failure to document plaintiff's knee pain, without more, is insufficient to state a claim for deliberate indifference), *report and recommendation adopted by* 2020 WL 3406329 (S.D. Ga. June 19, 2020); *Beene v. Rasseki*, No. 3:10-0285, 2010 WL 2196597, at \*7 (M.D. Tenn. May 27, 2010) (finding plaintiff failed to state an Eighth Amendment claim based on errors in his medical records, in part, because he failed to allege systematic inadequacies in the prison's recordkeeping). Further, it is well settled in the Sixth Circuit that "'failure to follow internal policies, without more,' does not equal deliberate indifference." *Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022) (quoting *Winkler*, 893 F.3d at 891).

The Court finds that Plaintiff has failed to present evidence from which a reasonable jury could find that Defendants RN Byrne and/or PA Farris were subjectively aware that Mr. Mathis suffered from a brain bleed or other serious condition and chose to consciously ignore his need for treatment, and thus that they acted with deliberate indifference on that occasion. The Court therefore finds that RN Byrne and PA Farris are entitled to summary judgment and dismiss Plaintiff's Eighth Amendment claim against them with prejudice.

### C. Qualified Immunity

Defendant RN Byrne alternatively contends that she is entitled to qualified immunity on Plaintiff's Eighth Amendment claim against her because the summary judgment evidence demonstrates that she has not violated Mr. Mathis's constitutional rights.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine "shields 'government officials performing discretionary functions' from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hudson v. Hudson*, 475 F.3d 741, 744 (6th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This immunity 'gives government officials breathing room to

make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Qualified immunity thus balances "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Although a defendant ordinarily bears the burden of proof for an affirmative defense, where a defendant raises qualified immunity, the plaintiff "bears the burden of showing that [the] defendant[ ] [is] not entitled to qualified immunity." *Gavitt v. Born*, 835 F.3d 623, 641 (6th Cir. 2016) (citing *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). Thus, in opposing a defendant's claim of qualified immunity, a plaintiff must show: (1) the defendant violated a constitutional right based on the facts alleged, and (2) that the right was clearly established. *Plumhoff v. Rickard*, 572 U.S. 765, 773-74 (2014); *Pearson*, 555 U.S. at 232. The district court may address the qualified immunity analysis in any order. *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016). If the plaintiff is unable to establish the violation of a constitutional right, the Court's inquiry ends, and the defendant is entitled to immunity. *Perez v. Oakland Cnty.*, 466 F.3d 416, 426-27 (6th Cir. 2006). However,

even if the plaintiff establishes a constitutional violation, he still bears the burden of showing that the constitutional right was clearly established at the time of the violation. *Cunningham v. Shelby Cnty., Tenn.*, 994 F.3d 761, 765 (6th Cir. 2021).

The Court finds that because, as discussed above, the record does not establish that RN Byrne's conduct in this case constitutes a constitutional violation, Plaintiff cannot defeat RN Byrne's qualified immunity defense, and RN Byrne is therefore entitled to qualified immunity for Plaintiff's § 1983 deliberate indifference claim against her under the Eighth Amendment. *See Perez*, 466 F.3d at 426-27 (citing *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 771 (6th Cir. 2005)).

## IV.  CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants Erin Byrne, RN's and Kim Farris, PA's, Motions for Summary Judgment (ECF Nos. 92 and 93) and **DISMISSES** Plaintiff's claim against both Defendants **WITH PREJUDICE**.

This is not a final ruling as the case remains stayed against Defendant Quality Correctional Care of Michigan a/k/a Corizon Health Inc.

IT IS SO ORDERED.

Dated: April 29, 2024                          s/ Paul D. Borman
                                               Paul D. Borman
                                               United States District Judge